NOTICE
Decision filed 09/11/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 150274

NO. 5-15-0274

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 10-CF-425 |
| | ) | |
| AARON JACKSON, | ) | Honorable |
| | ) | John Baricevic, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Presiding Justice Barberis and Justice Goldenhersh concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Aaron Jackson, appeals his conviction for first degree murder. He argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt due to credibility problems with two State witnesses and weaknesses in the forensic evidence. The defendant also argues that he was prejudiced by the admission of portions of a letter written by one of the witnesses to the court and by remarks during closing arguments in which the prosecutor overstated the strength of the forensic evidence. He contends that he was denied a fair trial by the cumulative effect of these claimed errors. Finally, the defendant argues that the court erred by allowing the State to present an argument at a preliminary inquiry into claims of

1

ineffective assistance of counsel he raised in a posttrial letter and that the court abused its discretion in declining to appoint a new attorney to help him present these claims. We affirm.

¶ 2                                    BACKGROUND

¶ 3     During the early morning hours of April 1, 2010, Washington Park Mayor John Thornton was shot to death in his vehicle. Witnesses told police that they heard gunshots, saw Mayor Thornton's car crash into a tree in a vacant lot, and then saw the defendant get out of Thornton's vehicle. Witnesses reported seeing the defendant limp from Mayor Thornton's car to a different car and drive away. The mayor was found in the driver's seat of his car. Both airbags had deployed. The defendant was arrested and charged with Thornton's murder.

¶ 4                                   The First Trial

¶ 5     The matter first came for trial in October 2011; however, the first trial ended in a mistrial. We need only discuss the testimony of two witnesses from that trial—Nortisha Ball and Laqueshia Jackson. Ball's testimony is relevant to this appeal because the defendant points to inconsistencies between her testimony at the two trials in arguing that the evidence was insufficient to prove him guilty beyond a reasonable doubt. Jackson's testimony is relevant because the defendant argues that counsel was ineffective for failing to call her as a witness in his second trial.

¶ 6     Ball was in jail awaiting trial on charges of residential burglary and theft when she testified in the defendant's first trial. She testified that she heard two gunshots and then saw a white car crash into a tree. She gave inconsistent testimony concerning what she witnessed after that. At one point, she said that she saw someone get out of the driver's side just before the car hit the tree, but she was not sure who it was. At another point, she acknowledged telling police that she saw the defendant get out of the car, but she did not remember which side of the vehicle

2

he exited. At another point, she testified that she could not remember anything that happened on the morning of the shooting because she was high.

¶ 7    Ball remembered giving a statement to police but could not remember what she told them. She first stated that when she was interviewed by Illinois State Police Special Agent Joseph Bates on the morning of the shooting, she told him the truth. She later testified, however, that what she told him "might not have been true because [she] was under the influence." She testified that she told Special Agent Bates that morning that she thought she saw "Chill" get out of the car. She explained that "Chill" was the defendant. She also testified that she picked the defendant's picture out of a photo array several days later. However, she claimed that she did so because Bates asked her if she knew any of the people pictured, and the defendant was the only person pictured whom she knew.

¶ 8    Laqueshia Jackson testified that she was in her car when the crash occurred. She explained that she was spending the night at her mother's house when she received an alert, notifying her that the burglar alarm had gone off at her house. When she got there, she was afraid to enter the house because the police were not there, so she decided to drive back to her mother's house. As she sat parked in her driveway making this decision, she heard gunshots. She did not recall how many shots she heard, but she knew it was more than one. As she drove to her mother's house, she saw a white car hit a tree. She then saw a man she knew as Chill get out of the passenger side. Jackson did not know Chill's real name, but she was able to recognize the defendant as Chill.

¶ 9    Jackson testified that she saw Chill limp from the white car to a white Suburban driven by her ex-boyfriend, David Taylor. Once Chill was in Taylor's vehicle, Taylor drove off. On cross-examination, however, Jackson testified that after learning from one of the investigating

3

officers that police were looking for a red Impala, she told the officer that she saw Chill drive off in a red Impala.

¶ 10　Jackson was asked about one of the investigating officers, Washington Park Detective Kim McAfee. McAfee was later indicted on federal charges unrelated to this case, and other officers involved in the investigation acknowledged at trial that they no longer considered him trustworthy as a result. Jackson testified that McAfee was present at the scene, but she did not speak with him. We note that according to Special Agent Bates, she did tell him that she spoke with McAfee.

¶ 11　Later during the trial, one of the prosecutors told the court about an anonymous call received by the state's attorney's office. The caller stated that if Laqueshia Jackson was recalled to the stand, she should be asked if a police officer offered her a bribe to testify that he was not at the crime scene. The court, prosecutors, defense counsel, and the defendant discussed the matter, and all agreed that Jackson should be questioned out of the presence of the jury to determine whether the caller was telling the truth. The trial proceeded while the state's attorney's office attempted to locate Jackson.

¶ 12　Once Jackson was located, she was questioned outside the jury's presence by the court, prosecutors, and defense counsel. She stated that she did not want to testify further in the case because she had been receiving threatening phone calls. She explained that the caller knew where she lived, where she worked, and what time her children got on the school bus. Jackson denied that she was offered a bribe. Initially, she reiterated that she did not talk to Detective McAfee about the case. However, she later testified that McAfee was present when she spoke to another investigating officer, but she "never said anything directly to McAfee."

4

¶ 13    Defense counsel indicated that, although he believed further cross-examination of Jackson in front of the jury would be useful for purposes of impeaching her testimony, he was concerned about the potential for prejudice if jurors were allowed to see Jackson sobbing on the witness stand. After consulting with the defendant, however, counsel decided to cross-examine Jackson in front of the jury.

¶ 14    On the stand in front of the jury, Jackson acknowledged that she previously testified that she never spoke with Detective McAfee in this case. She could not remember whether she ever told other officers that she did talk to him. Counsel then tried to ask Jackson why she testified that she never spoke to McAfee, but she did not respond. The court and attorneys for both parties later stated for the record that the jury was removed from the courtroom after Laqueshia Jackson went into what they described as a "stupor." Jackson suffered a seizure after the jury was removed.

¶ 15    The following morning, deputy court clerk Mary Ponder testified out of the presence of the jury about a phone call she received from Laqueshia Jackson's sister, Angela Dodd. Dodd informed Ponder that Jackson suffered another seizure that morning. Dodd told Ponder that Jackson was admitted to the hospital because her blood pressure was dangerously high and the paramedics were concerned that she might suffer a stroke. Ponder further testified, "She also told me that she was a witness when [Detective] McAfee told Laqueshia Jackson that if she kept her mouth shut, he would pay her off." The state's attorney then told the court about a phone conversation he had with Jackson the previous day while he was attempting to locate her. He stated that Jackson acknowledged to him that McAfee offered her money "if she would just keep his name out of it and say that he was not in the area at that time." However, he noted that she also told him that her testimony about what she saw the morning of the shooting was accurate.

5

¶ 16   The defendant moved for a mistrial, and the State did not object. The court granted the motion.

¶ 17                              The Second Trial

¶ 18   The defendant's second trial took place in April 2012. Nortisha Ball, who was by then serving a four-year sentence for burglary, again testified for the State. She testified that she was outside "just hanging out" when she witnessed the car crash. She also testified that she was "intoxicated, under the influence" at the time. Ball testified that she saw the person who was sitting in the passenger seat get out of the car, but she could not see his face. She admitted that she told police that she saw Chill get out of the car, but she then said that she did not know if it was him. Asked what she told police about Chill, Ball initially said she could not remember. She then acknowledged that she told police that he got out of the car, limped to another car, and drove away with another individual.

¶ 19   Ball testified that after the crash, she was approached by a police officer she knew, Sergeant Wendell Wilson. She stated that they talked, but not about the crash. We note that Sergeant Wilson testified that Ball approached him. Ball testified that she spoke to both Special Agent Bates and Detective McAfee that morning. The prosecutor asked Ball about the photo array. She acknowledged that she was shown photographs and asked if she recognized "anyone that got out of that car." She further acknowledged that she circled the defendant's picture. However, she testified that she did so because Detective McAfee told her to pick the defendant. She admitted that she did not inform Special Agent Bates of this. When asked why, she said he did not ask.

¶ 20   At this point, the court granted the State's request to declare Ball a hostile witness over the defendant's objection. After being declared a hostile witness, Ball admitted that she lied to

6

Special Agent Bates. She admitted that she saw someone get out of the car and that she told Bates it was Chill, but she claimed that she did not actually know who the person was.

¶ 21    On cross-examination, Ball testified that Detective McAfee transported her to the police station. She testified that during the ride, McAfee told her that she would be arrested. According to Ball, he told her that he already knew from another witness that the defendant was the person who got out of the mayor's car. Asked by defense counsel if McAfee told her to tell officers that it was the defendant, Ball said, "Yes."

¶ 22    Defense counsel then asked Ball if she had been "threatened by anybody about this case." Ball stated that she had not been threatened or pressured either by law enforcement officers or by anybody "in the street." She testified, however, that she was scared because her cousin told her that her name was in the newspaper, which meant that people knew she was involved with the case.

¶ 23    On redirect, Ball was asked why she previously gave testimony under oath that was different from the testimony she was giving now. Ball stated that she "didn't understand what was going on" the first time she testified. Asked why she never mentioned McAfee's threat any of the other times she discussed this case, Ball said she was never asked. The prosecutor asked her to acknowledge that she was specifically asked by Special Agent Bates whether anyone threatened her or promised her anything to get her to make a statement. Ball replied, "I wasn't paying attention."

¶ 24    Over defense counsel's objection, the State was allowed to question Ball about a letter she sent to the court after the first trial ended. The following exchange occurred:

"Q. Did you write the letter that said, 'To Judge Wharton, from Nortisha, I'm so scared.' Do you remember writing that?

7

A. Yes.

Q. And that you asked him to put you in protective custody at the jail because you were scared, do you remember that?

A. Yes.

Q. And did you say in the letter, 'Please help me. I'm admitting to everything that happened. It was Jackson that killed the mayor.' Did you put that in your letter?

A. Yes."

Ball acknowledged that McAfee did not tell her to write the letter. Asked if she wrote the letter because she believed she was being threatened, Ball replied, "No, I was just in the paper and I was scared." She claimed that she did not write everything in the letter, but she acknowledged writing, "I'm being threatened." When asked if that was "another lie," she said, "Yes." Asked why she lied in the letter, Ball said that she did not know.

¶ 25    Later during the trial, a recording of Ball's interview with Special Agent Bates was played for the jury. In it, Ball told Bates and another officer that she saw Chill get into a white car. She did not know the driver's name, but she knew that Chill's real name was Aaron. She told the officers that Chill was not limping before he got into the car. She told them that she then heard two gunshots followed by a screeching sound. She then saw the car run into a tree. She stated, "Chill got out of the car and limped away." She told the officers that someone walked up to Chill and that Chill and the other individual got into another car together and drove away. She told them that Chill drove the second car. Ball did not know the other individual; however, she described the clothing both men were wearing. Asked how she got to the police station, Ball said she was driven there by "Kim." Asked if she was under the influence of any drugs or alcohol, she

said, "No." Ball was asked if she saw the defendant with a gun. She said, "He probably had it in his pocket."

¶ 26    Gilda Lott also testified for the State about the events at issue. Lott was first interviewed by police in March 2012, nearly two years after the murder. Prior to that time, she never contacted police to tell them that she had information about the murder. She was in jail awaiting trial on a charge of reckless driving when she first spoke to police about this case, and there were criminal charges pending against her when she testified at trial a month later.

¶ 27    Lott testified that she was standing outside, talking to friends, on the morning of the shooting, when she saw a car strike a tree. Asked what happened after the car struck the tree, Lott first testified, "I just see Chill get out the car and run, and jump in a car with somebody else." She later testified that Chill limped to the other car and that she did not see anyone else in the other car. According to Lott, she saw Chill get out of the driver's side of the car that crashed.

¶ 28    On cross-examination, defense counsel attempted to ask Lott about a meeting she had with him and his investigator, Mike Boyne. Lott acknowledged that she met with them, but she insisted that she could not remember what she told them. She testified that she had memory problems because she had recently been hit in the head with a baseball bat. Asked how she could remember what happened on the morning of the murder, two years before trial, if she was unable to remember a conversation that took place three days earlier, Lott replied, "Because when I got hit in my head, before I could remember very well."

¶ 29    Mike Boyne, defense counsel's investigator, testified for the defense about the conversation he and counsel had with Gilda Lott. Boyne testified that Lott was reluctant to talk to them because she was afraid that they would arrest her. However, she told them that she did not see anything the morning of the murder. According to Boyne, when Lott was asked why she

9

made statements about the murder, she said that she thought it would help her get out of jail in her pending criminal case. Boyne further testified that when he asked Lott to give a written statement, she told him that she could not do so at that time because she had to take her children somewhere, but she said she would be willing to give a statement later. However, she never did.

¶ 30    Special Agent Joseph Bates was the lead investigator in the case. He interviewed the defendant and Nortisha Ball on the morning of the murder, and he showed Ball a photo array six days later. Both of the interviews were video-recorded. Bates testified that he did not know who killed Mayor Thornton until Ball told him that she saw the defendant get out of Thornton's car. He stated that from that point on, the defendant was the focus of the investigation. He acknowledged that police made no efforts to find out if the mayor had any enemies or to obtain call logs from the cell phone that was found in his car.

¶ 31    The defendant's video-recorded interview with Special Agent Bates was played for the jury. In it, the defendant told Bates that in the early morning hours of April 1, 2010, he was walking down the street in the vicinity of where Mayor Thornton's car crashed. He stated that he heard gunshots and then his leg started to hurt. The defendant stated that he "got out of there" and went to his girlfriend's apartment. However, he did not remember how he got home. In the video, the defendant can be seen limping.

¶ 32    The defendant's girlfriend, Cynthia Hooker, testified that the defendant borrowed her vehicle, a red Impala, on the night of March 31, 2010. After giving him permission to use the car, she went to sleep. She testified that the defendant had returned to her apartment by the time she awoke shortly before 7 the next morning. He told her that he was out gambling all night and was not cheating on her. Hooker testified that she and the defendant heard about the murder of John Thornton while watching the news on television. She stated that as they were watching the

10

news, police arrived in front of her apartment building, put her red Impala on a tow truck, and then came to the door. According to Hooker, the defendant seemed just as surprised as she was that police officers were there. However, she testified that he told her before the officers came to the door that they must have been looking for him.

¶ 33    The State also presented testimony explaining forensic evidence. Forensic scientist Ellen Chapman tested swabs taken from both of the defendant's hands shortly after he was arrested. She found particles consistent with gunpowder residue in the swab taken from his left hand but not in the swab taken from his right hand. She testified that gunpowder residue can easily be transferred from surface to surface.

¶ 34    Trace particles expert Robert Berk examined the defendant's clothing in November 2011, after a mistrial was declared in the defendant's first trial. Berk found small amounts of particles consistent with gunpowder residue on the defendant's jeans and T-shirt but found none on his sweatshirt. Berk explained that the presence of gunpowder residue does not necessarily mean that the individual fired a weapon. It could mean that the individual has "handled, fired, or been in close proximity when a weapon was discharged." Berk also tested the defendant's clothing and the swabs from his hands for evidence of particles consistent with the air bags in John Thornton's car; however, he found no evidence of these particles.[1]

¶ 35    Fingerprint examiner Melissa Gamboe testified that of the 57 fingerprints lifted from Thornton's car, only 26 were suitable for comparison. Of those, one matched the defendant's fingerprint. That print was found on the exterior of the vehicle on the front portion of the rear

---

[1]We note that the State presented extensive testimony about the types of physical evidence that might demonstrate that a passenger was in John Thornton's vehicle when the air bags deployed. For purposes of this appeal, it is sufficient to state that forensic scientists found no such evidence but that witnesses explained that this does not necessarily mean that he was not in the car when it crashed. It is worth noting, however, that there was evidence that the sample tested from the interior of one of the air bags contained a "high concentration" of bromine particles.

passenger side door. Gamboe testified that there was no way to determine the age of a fingerprint. She explained, however, that environmental conditions can cause a print to deteriorate. For example, heat might cause the print, which is mostly comprised of moisture, to evaporate, and rain might wash it away. She also noted that dust might distort a print.

¶ 36    DNA analyst Jay Winters tested a small bloodstain found on the defendant's jeans. He was only able to obtain a partial DNA profile from the blood. He compared that partial profile to DNA profiles of both the defendant and John Thornton. Winters was able to exclude the defendant but was not able to exclude Thornton. He testified that although he could not call the sample a "match," he could conclude with a reasonable degree of scientific certainty that the blood on the defendant's jeans "likely" came from Thornton. Winters explained that the partial profile found in the bloodstain is found in only 1 in 46,000 unrelated African-American individuals, 1 in 73,000 unrelated white individuals, and 1 in 17,000 Hispanic individuals.

¶ 37    The jury returned a verdict of guilty. The court subsequently sentenced the defendant to 35 years in prison. On September 7, 2012, the court denied the defendant's posttrial motion after a hearing. The defendant filed an appeal that same day.

¶ 38                    Posttrial Claims of Ineffective Assistance of Counsel

¶ 39    On September 12, 2012, the defendant sent the court a letter in which he argued that the evidence was insufficient to prove his guilt and alleged that he was not fairly represented by counsel. In particular, he asserted that counsel should have called Laqueshia Jackson to testify in his second trial. He also alleged that Nortisha Ball falsely claimed that she was threatened by members of the defendant's family and that Detective McAfee planted physical evidence against him.

12

¶ 40    This court subsequently dismissed the defendant's then-pending appeal, finding it to be premature. We remanded the cause to the trial court with directions to conduct a preliminary inquiry into the defendant's claims of ineffective assistance of counsel as required under *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny.

¶ 41    The court held a preliminary *Krankel* inquiry on May 28, 2015. By that time, Judge Wharton, who presided over the defendant's trial, had retired. The matter was therefore assigned to Judge Baricevic. The court asked the defendant to elaborate on his claims of ineffective assistance of counsel and allowed defense counsel to respond to each of the defendant's claims.

¶ 42    The defendant first addressed counsel's decision not to call Laqueshia Jackson as a witness in his second trial. He told the court that Jackson recanted her earlier statement and said that she saw Detective McAfee at the scene of the crime. The defendant told the court that he asked counsel multiple times to call her as a witness, but he did not do so. Counsel explained, however, that he and the defendant made a joint decision not to call Laqueshia Jackson as a witness. Even though she did give counsel a statement recanting her previous testimony, she later contacted prosecutors and indicated "an eagerness and willingness to testify on behalf of the State." Counsel explained that he and the defendant agreed that it would be best not to call her due to uncertainty over what she might say on the stand. The defendant denied that these discussions ever took place.

¶ 43    The defendant next told the court that counsel was ineffective for failing to call Laqueshia Jackson's sister, Angela Dodd, in his second trial. The defendant claimed that he asked counsel to call Dodd as a witness because she had informed counsel that she heard McAfee offer her sister a bribe, but counsel did not do so. Counsel told the court that his only

13

recollection of Dodd was speaking with her when he was trying to locate Jackson after she suffered a seizure during the first trial.

¶ 44    The defendant next complained that counsel failed to introduce evidence to show that DNA testing of the bloodstain on his jeans was unreliable because it was based on a partial DNA profile. Counsel explained that he made a strategic decision to argue that the evidence did not prove the defendant was ever inside Thornton's vehicle because the tiny bloodstain could have been picked up from blood that was found on the exterior of the car rather than "getting into a fight about whether it's his or not."

¶ 45    The defendant next addressed the closing arguments he challenges in this appeal—the prosecutor's reference to a "fresh print" matching the defendant's fingerprint and his arguments that the DNA profile in the bloodstain on the defendant's jeans "matched" Thornton's DNA and the blood was Thornton's blood. Counsel told the court, "If I thought anything was improper, I would have objected."

¶ 46    Finally, the defendant complained of counsel's failure to call two alibi witnesses. He told the court that he gave defense counsel both names, but counsel did not call the witnesses. According to counsel, he was unable to locate one of the witnesses, and he decided not to call the second witness because he learned that the witness was drunk at the time of the murder and unable to recall any information that could have been helpful to the defendant at trial.

¶ 47    After the defendant presented his claims, the court asked the prosecutor if he wished to comment. The prosecutor reminded the court that most of the defendant's claims related to the sufficiency of the evidence. He then noted that the only claim of ineffective assistance raised in the defendant's letter to Judge Wharton was his claim that counsel should have called Laqueshia Jackson in the second trial. He noted that defense counsel had already testified "that he made a

14

trial strategy decision." The prosecutor then told the court, "I think if the Court reviews the transcripts of both trials, *** the Court will find that Mr. Keefe was a tenacious opponent, to say the least." He concluded by asking the court to find that there was no need to appoint another attorney to present the defendant's claims of ineffective assistance. He told the court, "I think Mr. Keefe's testimony as well as that of the defendant indicates this was trial strategy on the two main points of ineffectiveness that he raised and the rest are evidentiary issues." The court took the matter under advisement so that Judge Baricevic could review the record.

¶ 48    On June 1, 2015, the court entered a detailed written order addressing the defendant's claims of ineffective assistance of counsel. The court first stated that it reviewed the record, including the transcripts from both trials. The court then noted that most of the defendant's arguments concerned the weight of the evidence or the credibility of witnesses. The court found that counsel addressed each of these issues at trial, explaining that counsel pointed out the weaknesses in the State's case in both his opening statement and his closing argument, and he "aggressively cross-examined" the State's witnesses on the issues raised by the defendant. The court then considered the defendant's claims concerning uncalled witnesses. The court noted that counsel looked for the witnesses the defendant wanted him to call but those witnesses "could not be found or [were] intoxicated when found." Significantly, the court noted that the defendant made no allegation that any witnesses would have provided testimony that would have changed the outcome of the trial. The court therefore denied the defendant's motion without appointing counsel or holding a more formal hearing. This appeal followed.

¶ 49                                    ANALYSIS

¶ 50                          Sufficiency of the Evidence

¶ 51    The defendant first argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt. We disagree.

¶ 52    When reviewing sufficiency-of-the-evidence claims, we view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could find all of the elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). It is the role of the jury, not the appeals court, to assess the credibility of witnesses and resolve conflicts in the evidence. *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004). We will reverse a defendant's conviction only if "the evidence is so unreasonable, improbable, or unsatisfactory" that it raises a reasonable doubt concerning the defendant's guilt. *Wheeler*, 226 Ill. 2d at 115.

¶ 53    The defendant argues that the evidence was insufficient to support his conviction for two reasons. First, he argues that both of the eyewitnesses, Nortisha Ball and Gilda Lott, gave accounts that were not credible enough to be believed. We note that the accounts at issue are Ball's statement to police and Lott's trial testimony. The defendant points out that both witnesses gave conflicting statements, Ball acknowledged being under the influence of drugs at the time of the murder, and Lott admitted to having memory problems. He also points to discrepancies in their stories. In particular, he notes that Ball said the defendant exited the passenger side of Thornton's car, while Lott testified that he exited the driver side. He also notes that Lott claimed that she was with a group of people that included Ball when she witnessed the crash, while Ball told police she was alone at the time and she testified that she did not know Lott. The defendant also points to inconsistent statements as to where the witnesses were standing when they

16

observed the car crash. He contends that because of these discrepancies and the credibility issues with both witnesses, no reasonable trier of fact could have believed their stories. We are not persuaded.

¶ 54    We reiterate that it is the function of the jury, as trier of fact, to resolve conflicts in the evidence and to assess the credibility of witnesses. *Lamon*, 346 Ill. App. 3d at 1089. It is true that the defendant could not have exited both sides of Thornton's vehicle, as he points out. It is also highly unlikely that he would have exited the driver's side, as Lott testified, because Thornton's body was found in the driver's seat, slumped over the steering wheel. However, jurors were not required to disregard Lott's story in its entirety because she did not remember which side of the car the defendant exited, nor were they required to disregard the witnesses' accounts due to other minor inconsistencies. See *People v. Wesley*, 382 Ill. App. 3d 588, 592 (2008). It is also worth noting that jurors had the opportunity to see the video recording of the statement Ball gave to police on the morning of the murder. That statement was given four hours after the murder. In it, Ball was not evasive, as both she and Lott were on the stand. Jurors could reasonably have found her initial statement to be credible.

¶ 55    Moreover, Ball's statement to police and Lott's testimony were not the only evidence linking the defendant to the murder. As discussed earlier, he admitted to police that he was at the scene, and his girlfriend testified that he was out that night driving her red Impala—the same type of car Ball saw the defendant use to leave the scene.

¶ 56    There was also physical evidence against the defendant, which brings us to his second argument concerning the sufficiency of the evidence. The defendant argues that the physical evidence "was weak and did not place him inside the car." We disagree.

17

¶ 57    In support of this argument, the defendant points out that the only fingerprint that matched the defendant's was found on the exterior of the vehicle and that the DNA analyst, Jay Winters, could not definitively say that the blood on the defendant's jeans came from the mayor. He acknowledges that gunpowder residue was found on his left hand and on his clothing, but he emphasizes the testimony of two of the State's experts, who explained that gunpowder residue does not necessarily indicate that an individual fired a weapon. He points out that there was no ballistic evidence linking the defendant to a specific weapon used in the murder. He also emphasizes that there were no fibers consistent with his clothing found in Thornton's vehicle, there were no hairs matching the defendant's hair found in the vehicle, and there were no particles consistent with Thornton's air bags found on his clothing.

¶ 58    The State acknowledged at trial, and acknowledges in this appeal, that no single piece of evidence, standing alone, was strong enough to support his conviction. However, when evaluating the sufficiency of the evidence, the question is not whether each individual piece of evidence is strong enough to support the conviction, but whether any reasonable jury, viewing *all* of the evidence in the light most favorable to the State, could have found the defendant guilty. *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We believe that the evidence, taken together, provided ample support for the defendant's conviction. The DNA sample taken from the bloodstain on the defendant's jeans provides strong evidence connecting the defendant to the crime. Although the sample yielded a partial profile which could not be called a "match," Winters was able to determine that the partial profile occurred in only 1 in 46,000 unrelated African-Americans, thereby making it likely, in his professional opinion, that the blood was John Thornton's. This evidence, combined with all the

18

other evidence we have discussed, was sufficient to allow a reasonable jury to conclude that the defendant shot John Thornton.

¶ 59                            Nortisha Ball's Letter

¶ 60    The defendant next challenges the use of Nortisha Ball's letter to Judge Wharton to impeach her credibility. Before addressing his argument, additional background is warranted.

¶ 61    Ball sent a four-page handwritten letter to the court just days after a mistrial was declared in the first trial. She asked Judge Wharton to place her in protective custody because she had been threatened by members of the defendant's family. She wrote, "I talked to my sister. She said Jackson['s] cousin came by with a gun and told her when I get out he was gone [*sic*] kill whoever's in the house." The defendant filed a motion *in limine* to exclude evidence of any allegations of threats made to witnesses. The court granted the motion but indicated that if defense counsel questioned witnesses on their reasons for changing their testimony, this would open the door for the State to inquire about the alleged threats. As discussed earlier, defense counsel did ask Ball whether anyone had threatened her. The State was then allowed to ask her about the contents of the letter. Ball admitted writing in the letter that, contrary to her earlier testimony, she was being threatened. However, she was *not* questioned about her sister's statement, the defendant's cousin's statement, or her allegation that the threats came from members of the defendant's family. In addition, the court ruled that the letter itself would not be sent to the jury.

¶ 62    The defendant argues that use of the letter was improper for two reasons. First, he argues that the letter contained inadmissible hearsay. This argument is unavailing. Although the letter did contain hearsay statements attributable to Ball's sister and the defendant's cousin, these statements were not presented to the jury.

19

¶ 63    Second, the defendant argues that the court allowed the State to use the letter to impeach Ball on a collateral matter. He points out that the letter was used to impeach her testimony that she had not been threatened by anyone in connection with the trial. He further argues that the error was highly prejudicial and requires reversal because Ball's credibility as a witness was crucial to the State's case. We reject this contention.

¶ 64    Prior inconsistent statements are generally admissible because they "are a vital tool to challenge witness credibility." *People v. White*, 2011 IL App (1st) 092852, ¶ 52. However, a witness may not be impeached on a collateral matter. *Collins*, 106 Ill. 2d at 269. A matter is collateral if it could not be introduced for any purpose other than to contradict the witness. *Id.* The testimony at issue was elicited during redirect examination. One of the purposes of redirect is to allow attorneys to ask witnesses "questions designed to remove unfavorable inferences or impressions raised by the cross-examination." *People v. Chambers*, 179 Ill. App. 3d 565, 577 (1989). However, the scope of redirect is limited to matters that were raised during cross-examination. *Id.*

¶ 65    The latitude allowed during cross-examination and redirect is a matter within the discretion of the trial court. *Collins*, 106 Ill. 2d at 269. The determination of whether a matter is "collateral" for purposes of proper impeachment is also a decision left to the discretion of the trial court. *Id.* at 269-70. We will not reverse the court's decision "unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant." *Id.* at 269.

¶ 66    We note that Ball's letter contradicted two aspects of her testimony—her claim that she did not really know who she saw getting out of John Thornton's car and her testimony denying that she had been threatened. Her testimony that she did not know who she saw leaving the car is clearly not a collateral matter. That testimony goes straight to the heart of the State's case. As the

20

State points out, prior inconsistent statements on noncollateral matters are admissible even if they are consistent with other prior inconsistent statements, such as Ball's statement to police. See *White*, 2011 IL App (1st) 092852, ¶ 53.

¶ 67    The defendant argues, however, that Ball's testimony that she was not threatened was a collateral matter. We disagree. It is true, as the defendant contends, that whether Ball received threats is not a question related to any of the elements of the crime. Nevertheless, it was relevant to help explain why her testimony was inconsistent with her statement to police, and it allowed the State to counter the "unfavorable inference" created by her cross-examination testimony that she had not been threatened. See *Chambers*, 179 Ill. App. 3d at 577.

¶ 68    Finally, we find that the potential prejudicial effect of the letter was minimized because the letter was not sent to the jury, Ball was not questioned about the source of the threats, and although the prosecutor did refer to the letter during closing argument, he did not mention the threats. We find no clear abuse of discretion in the court's decision to impeach Ball with portions of the letter.

¶ 69                                   Closing Arguments

¶ 70    The defendant next argues that he was denied a fair trial by improper and prejudicial remarks during the State's closing argument. He argues that the prosecutor improperly referred to the fingerprint found on the vehicle as a "fresh print," even though there was no evidence as to the age of the print. He also complains that the prosecutor told jurors that the DNA profile from the bloodstain on the defendant's jeans "matched" John Thornton's DNA and that he told them multiple times that John Thornton's blood was on the defendant's jeans. The defendant argues that these comments misstated the evidence because Jay Winters testified that the sample could not be called a match and that the blood was "likely" that of Mayor Thornton. He acknowledges

21

that counsel did not object to any of these comments, but he urges us to consider them under the plain error doctrine. We are not persuaded.

¶ 71    Prosecutors are afforded considerable latitude in closing arguments. *People v. Smith*, 141 Ill. 2d 40, 60 (1990). A prosecutor may argue facts in evidence and may draw any reasonable inferences from that evidence. However, a prosecutor may not misstate the evidence and may not argue assumptions that are not based on the evidence. *People v. Rivera*, 277 Ill. App. 3d 811, 821 (1996). In deciding whether challenged remarks are improper, we must consider the remarks in the context of the closing argument as a whole. *Wheeler*, 226 Ill. 2d at 122. Improper remarks do not always require reversal. They require reversal only if the remarks "result in substantial prejudice to the defendant." *Smith*, 141 Ill. 2d at 60. In other words, reversal is warranted only in cases where it is impossible to know whether or not the improper comments contributed to the defendant's conviction. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991).

¶ 72    We first consider the prosecutor's comments about the DNA evidence. The prosecutor first reminded jurors that according to Winters, the bloodstain found on the defendant's jeans could not be his own blood. He then stated, "You heard Jay Winters say it's likely the victim's blood, and he said the profile only occurs in one in 46,000 blacks." He reminded jurors that the population of Washington Park is approximately 4200, a fact to which the parties stipulated. He then argued, "So think about it. Take ten villages the size of Washington Park and put them side by side, and that profile that matched John Thornton's is going to come up one time." He acknowledged that Winters said that he could not say definitively that the blood was John Thornton's blood. He argued, however, that based on the statistical likelihood, jurors could conclude that the blood was Thornton's. The prosecutor argued, "So we know that that blood again is John Thornton's." He went on to discuss other evidence but then came back to the

22

bloodstain, telling jurors, "And we have the mayor's blood, and I submit to you, using your common sense, one in 48,000, it's the mayor's."[2]

¶ 73    The defendant argues that the prosecutor misstated Winters' testimony about the DNA evidence in two respects. First, he argues that the statements that the blood was Mayor Thornton's were not based on the evidence because Winters only testified that it was "likely" Thornton's blood. We disagree. The prosecutor acknowledged that Winters testified that it was impossible to definitively determine that the blood came from Mayor Thornton. He then gave jurors a reason to conclude that it was in fact Mayor Thornton's blood. This argument was based on the evidence presented, and the conclusion that the blood was John Thornton's was a reasonable inference to be drawn from the evidence.

¶ 74    The defendant also challenges the prosecutor's statement that the DNA profile "matched" John Thornton's. A more detailed discussion of Jay Winters' testimony is helpful to our resolution of this argument.

¶ 75    As discussed earlier, Winters testified that the sample could not be called a "match." He also testified that it is never possible to determine with absolute certainty that DNA found in a sample comes from a specific individual. He testified, however, that some samples can be characterized as "matches." Winters was asked to explain the difference. He explained that a sample can be deemed to be a "match" when "all the alleles detected in an item of evidence match the profile from the individual I'm comparing it to." By contrast, he explained that in "a situation that the profile is incomplete at some loci," he can conclude only that an individual cannot be excluded and he cannot "use the term 'match.'" Winters further explained that when

---

[2]We note that this is a misstatement of Winters' testimony that one in 46,000 African-Americans would have the same partial profile. However, the defendant does not challenge this statement. As mentioned, the prosecutor used the accurate figure of 46,000 earlier in his argument.

an individual cannot be excluded, he can then enter the DNA profile from the sample into a computer database that determines how common that profile is in the general population.

¶ 76    We agree with the defendant that the prosecutor's use of the term "matched" misstated Winters' testimony.[3] However, we do not believe this comment was prejudicial enough to warrant reversal. It was an isolated comment in the middle of a detailed argument in which the prosecutor accurately explained to jurors what Winters' analysis of the DNA sample could and could not tell them about the blood. Reading the State's argument in its entirety, the prosecutor acknowledged that the blood could not be deemed a "match" but gave jurors rational reasons to find that the blood was John Thornton's.

¶ 77    We next consider the prosecutor's remarks about the fingerprint. During the State's initial closing argument, he pointed out that the defendant's fingerprint was found on John Thornton's car. He did not initially refer to the print as a "fresh print." During the defendant's closing argument, counsel argued that the prosecution "tried to get [Gamboe] to commit that it had to be a recent print *** but she wouldn't do it." He reminded jurors that Gamboe testified that it was impossible to determine the age of a fingerprint. He also reminded jurors that there were numerous prints lifted from the vehicle that were suitable for comparison, including two found in the interior. He emphasized that neither of the prints lifted from the interior of the vehicle matched the defendant's print and that none of the prints were compared to John Thornton's prints or entered into a database to determine whose prints they were. During rebuttal argument, the prosecutor did not directly address defense counsel's argument concerning the age of the print. He emphasized that the print was found on the passenger side of the car, the side the

---

[3]We note that it would not be inaccurate to say that the genetic variations, or alleles, found in the partial profile matched those in John Thornton's known profile, even though it was impossible to determine whether the alleles in the missing parts of the profile would also match Thornton's. However, use of the term "match" is misleading.

defendant exited. He then addressed the defendant's argument that numerous other prints were found on the car that did not match the defendant's. He stated, "You heard from Melissa Gamboe, a fresh print—or [crime scene investigator] Abby Keller, I'm sure there's lots of prints."

¶ 78    We agree with the defendant that this remark misstated the evidence. The State argues that the prosecutor could properly infer from Gamboe's testimony that the print was a fresh print. This is because she testified that weather conditions such as heat or rain can cause a print to deteriorate. Although we agree that this is a reasonable inference, the prosecutor told jurors that they heard from Gamboe that it was a fresh print. That is not accurate. However, we do not believe this isolated remark played any role in the jury's verdict. The prosecutor made several references to the fingerprint and only referred to it once as a "fresh print." The emphasis of his argument was on the location of the print, not its age. We do not believe either of the two comments we have found to be inaccurate would have been prejudicial enough to warrant reversal even if counsel had objected, and they certainly did not rise to the level of plain error.

¶ 79                                    Cumulative Error

¶ 80    The defendant next argues that the cumulative effect of these asserted errors deprived him of a fair trial. We have already found that the court properly permitted the State to question Nortisha Ball about her letter to Judge Wharton, that some of the prosecutor's challenged remarks were proper, and that the improper remarks were not prejudicial enough to warrant reversal. We therefore reject the defendant's claim that cumulative error denied him a fair trial.

¶ 81                        Krankel Inquiry and Harmless Error

¶ 82    The defendant raises two issues concerning the court's inquiry into the claims of ineffective assistance of counsel he raised in his letter to Judge Wharton. First, he contends that

25

the court erred in allowing the State to participate in the preliminary inquiry. Second, he contends that the court erred in declining to appoint counsel to help the defendant present those claims because he showed that counsel may have neglected his case. We reject both contentions.

¶ 83     When a defendant raises a *pro se* claim of ineffective assistance of counsel, the court "must inquire adequately into the claim and, under certain circumstances, must appoint new counsel to argue the claim." *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 25 (citing *Krankel*, 102 Ill. 2d at 187-89). However, the court is not always required to appoint new counsel or hold a full evidentiary hearing on a defendant's claims. *People v. Moore*, 207 Ill. 2d 68, 77 (2003); *People v. Crutchfield*, 2015 IL App (5th) 120371, ¶ 24. The court should first conduct a preliminary inquiry into the factual basis of the defendant's claims. *Moore*, 207 Ill. 2d at 77-78; *Crutchfield*, 2015 IL App (5th) 120371, ¶ 24. If, after conducting this inquiry, the court determines that the defendant's claims lack merit or relate solely to matters of trial strategy, the court may deny the defendant's *pro se* motion without appointing new counsel or holding further proceedings. If, however, the court finds that the defendant has shown possible neglect of his case by counsel, the court should appoint a new attorney to represent the defendant at a hearing on those claims. *Moore*, 207 Ill. 2d at 78; *Crutchfield*, 2015 IL App (5th) 120371, ¶ 25.

¶ 84     The procedure to be followed at a preliminary *Krankel* inquiry "is somewhat flexible." *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40. It is appropriate for the court to consider its own knowledge of counsel's performance during the trial. It is also appropriate—and in most cases necessary—for the court to discuss the allegations with the defendant and to ask questions of trial counsel. *Id.* ¶ 39. However, the State should not be "an active participant during the preliminary inquiry." *Id.* ¶ 40. Ordinarily, "virtually no opportunity for State participation is

26

offered during" this stage. *Id.* Our supreme court has held that "it is critical that the State's participation at that proceeding, if any, be *de minimis*." *People v. Jolly*, 2014 IL 117142, ¶ 38.

¶ 85    The State's participation in preliminary *Krankel* proceedings is limited by the nature of those proceedings. As our supreme court explained in *Jolly*, the purpose of the preliminary inquiry is to enable the court to create "an objective record for review" of the defendant's claims "and thus potentially limit issues on appeal." *Id.* ¶¶ 38-39. The goal of creating an objective record for review is thwarted if the State is permitted "to bias the record against a *pro se* defendant" by subjecting the evidence or information gleaned at the preliminary inquiry to "one-sided adversarial testing." *Id.* ¶ 39. In addition, State participation in a preliminary inquiry creates a risk that the inquiry "will be turned into an adversarial proceeding, with both the State and trial counsel opposing the defendant," which is problematic because it forces a defendant to act *pro se* in an adversarial proceeding even if he has not waived the right to counsel. *Fields*, 2013 IL App (2d) 120945, ¶¶ 40-41.

¶ 86    We will not overturn the court's determination that a defendant's claims do not require the appointment of new counsel unless that determination is manifestly erroneous. *Crutchfield*, 2015 IL App (5th) 120371, ¶ 20. However, we review *de novo* questions concerning the manner in which the inquiry was conducted. *Skillom*, 2017 IL App (2d) 150681, ¶ 25.

¶ 87    The defendant argues that the State's participation at the preliminary inquiry in this case was adversarial and "more than *de minimis*." This is so, he contends, because the State was permitted to make direct arguments against his claims of ineffective assistance of counsel. The State argues that its participation was *de minimis* at most. The State notes that prior to the end of the hearing, when the court asked if the prosecutor had any comments, the State "sat quietly at its counsel table and listened." The State surmises that the court only asked the prosecutor to

27

comment because the judge hearing the inquiry was new to the case and "was trying to gain an on-the-record framing and context before reviewing the record."

¶ 88    We are not convinced by the State's characterization of its participation. Contrary to the State's assertion, the prosecutor did more than frame the issue and provide context; he presented an argument in opposition to the defendant's claim of ineffective assistance of counsel. For the reasons that follow, we cannot find that this argument amounted to *de minimis* participation, but we find the error to be harmless under the facts and circumstances of this case.

¶ 89    Although the State's participation in this matter was fairly minimal in comparison to some of the cases we will discuss, this does not necessarily make its participation *de minimis*. We find the First District's decision in *People v. Flemming*, 2015 IL App (1st) 111925-B, instructive. There, the defendant made an oral motion for new trial based on allegations of ineffective assistance of counsel. *Id.* ¶ 45. The trial court asked the defendant to elaborate on his claims and then asked the prosecutor to question defense counsel. *Id.* ¶¶ 45-46. The prosecutor asked counsel a total of seven questions. *Id.* ¶ 46. The trial court denied the defendant's motion, and the defendant appealed. *Id.* ¶ 47.

¶ 90    On appeal, the First District initially found the State's participation to be *de minimis*. *Id.* ¶ 88. However, the court reversed this decision after being directed by the supreme court to reconsider its ruling in light of *Jolly*. *Id.* ¶ 89. The court acknowledged that "the State's participation was minimal." *Id.* ¶ 90. However, the court also noted that the State's questions to defense counsel elicited testimony that refuted the defendant's claims. *Id.* Because this type of adversarial advocacy was " 'contrary to the intent of a preliminary *Krankel* inquiry,' " the court concluded that it was more than *de minimis* participation. *Id.* (quoting *Jolly*, 2014 IL 117142, ¶ 40).

¶ 91    Here, too, the State's participation included adversarial advocacy. As noted, the State argued that the defendant's claims should be denied without further proceedings and the appointment of a new attorney. That argument went on, uninterrupted, for nearly two pages in the transcript. See *People v. Gore*, 2018 IL App (3d) 150627, ¶ 38 (rejecting the State's argument that its participation was *de minimis* where the prosecutor "spent nearly two uninterrupted pages of record arguing vociferously against [the] defendant's claims"). The fact that this argument took place at the end of a hearing during which the State previously "sat quietly at its counsel table and listened" does not transform the State's argument into *de minimis* participation. See *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 80 (rejecting the State's argument that its participation was *de minimis* where the prosecutor presented arguments at the end of the preliminary inquiry rather than addressing each of the defendant's claims as he made them).

¶ 92    We also note that the State's participation in this matter was markedly different than the type of participation that courts have found to be *de minimis*. In *Fields*, the Second District suggested that *de minimis* participation might occur in "a situation where the State may be asked to offer concrete and easily verifiable *facts* at the hearing." (Emphasis in original.) *Fields*, 2013 IL App (2d) 120945, ¶ 40. In *People v. Peters*, 2018 IL App (2d) 150650, ¶ 26, the trial judge and the prosecutor discussed a pending *pro se* motion alleging ineffective assistance of counsel one week before the court held a *Krankel* inquiry. The prosecutor told the judge that he could make his own independent assessment of defense counsel's performance, but he noted that the motion included matters related to trial strategy, and he stated, " 'I believe that he did receive adequate representation.' " *Id.* The trial court conducted a hearing the following week without input from the State. *Id.* ¶ 27. On appeal, the Second District found that these comments "rose

29

only to the level of *de minimis*." *Id.* ¶ 31. Here, the State's participation consisted of more than the few passing comments involved in *Peters* and was not limited to providing concrete verifiable facts as contemplated by the *Fields* court. We cannot find the State's participation in this matter to be *de minimis*. The next question is whether reversal is required.

¶ 93    Our supreme court considered this very question in *Jolly*. During the *Krankel* inquiry in that case, the trial court allowed the defendant to explain each of his claims of ineffective assistance of counsel but "repeatedly stopped [the] defendant from making any argument on his claims." *Jolly*, 2014 IL 117142, ¶ 18. The court explained to the defendant that the purpose of the hearing was to ascertain what his claims were, not to argue the merits of those claims. *Id.* The court then allowed the State to question defense counsel as a witness but did not allow the defendant to cross-examine him. *Id.* ¶ 19. The court finally permitted both parties to present arguments on whether a full evidentiary hearing was necessary. *Id.* ¶ 21.

¶ 94    Before ruling, the court told the parties that it would consider the court file, its own observations of defense counsel's performance during the trial, and the statements of both the defendant and his attorney at the preliminary *Krankel* hearing. *Id.* ¶ 22. As noted, the statements of defense counsel were elicited through questioning by the State. *Id.* ¶ 20. The court also indicated that it would consider the judge's personal knowledge of defense counsel's work over the years as a criminal defense attorney in previous unrelated cases. *Id.* ¶ 22. The court denied the defendant's *pro se* motion, and the defendant appealed. *Id.*

¶ 95    Obviously, what occurred in *Jolly* was far more egregious than what occurred in this case. Indeed, the State conceded on appeal in *Jolly* that the trial court erred. *Id.* ¶ 27. The State argued, however, that the errors were harmless because the inquiry created an adequate record for appellate review and because the defendant's underlying claims of ineffective assistance

30

lacked merit. *Id.* The Fourth District agreed, finding that the court "thoroughly examined the factual matters and questioned both [the] defendant and his trial counsel in a fair and impartial manner" and that two of the defendant's underlying claims lacked merit. *Id.* ¶ 37.

¶ 96   The supreme court reversed that decision, holding that in light of "the rationale of *Krankel* and its progeny," it could not "conclude that the circuit court's error in [that] case was harmless beyond a reasonable doubt." *Id.* ¶ 40. As stated previously, the primary purpose of a preliminary inquiry is to create "an objective record for review" of the defendant's claims. *Id.* ¶ 39. The supreme court explained, however, that the State's active participation in the inquiry in that case allowed it "to bias the record against a *pro se* defendant." *Id.* The court went on to explain that the record produced at a hearing "with one-sided adversarial testing cannot reveal, in an objective and neutral fashion, whether the circuit court properly decided that a defendant is not entitled to new counsel." *Id.* The court therefore concluded that the appropriate remedy in that case would be to remand the matter for a proper preliminary *Krankel* inquiry in front of a different judge. *Id.* ¶ 46.

¶ 97   The *Jolly* court did not specifically hold that allowing the State to participate in more than a *de minimis* role could *never* amount to harmless error. See *Skillom*, 2017 IL App (2d) 150681, ¶ 28. Two courts have considered this question after *Jolly* and reached different results. See *Gore*, 2018 IL App (3d) 150627, ¶ 39; *Skillom*, 2017 IL App (2d) 150681, ¶ 28.

¶ 98   In *Skillom*, the trial court did not ask the defendant about his claims at the *Krankel* inquiry. Instead, the court asked defense counsel to call the defendant as a witness and question him. The court then allowed the State to cross-examine the defendant and directed both parties to present arguments. *Skillom*, 2017 IL App (2d) 150681, ¶ 27. On appeal, the Second District found that there was "no question that the trial court erred" in conducting the preliminary inquiry

31

in this manner. *Id.* The State, however, argued that the error was harmless. *Id.* ¶ 28. Before considering whether the error was harmless, the court had to decide whether harmless error analysis was appropriate after *Jolly*. In addressing that question, the court first noted that the *Jolly* court did not explicitly hold that errors in how preliminary *Krankel* inquiries are conducted can never constitute harmless error. *Id.* The court then noted that the *Jolly* court "specifically declined to hold that the error in that case constituted structural error." *Id.* (citing *Jolly*, 2014 IL 117142, ¶ 45). The *Skillom* court explained that errors that are not structural may be found to be harmless. *Id.* (citing *Neder v. United States*, 527 U.S. 1, 7-8 (1999)). The court then found that the error in the case before it was harmless beyond a reasonable doubt because the objective record rebutted the defendant's claims of ineffective assistance of counsel. *Id.* ¶ 30.

¶ 99 In *Gore*, the Third District reached the opposite conclusion. There, the defendant raised several claims of ineffective assistance of counsel, including failure to subject the State's case to adequate adversarial testing, failure to provide the defendant with discovery materials, and the fact that counsel was apparently sick during the trial and may not have been fully alert. See *Gore*, 2018 IL App (3d) 150627, ¶¶ 12-15. At the preliminary *Krankel* hearing on these claims, the State participated in a "long discussion" about the defendant's allegations. *Id.* ¶ 13. After discussing all of the defendant's claims, the court asked the State for its input. The State responded with an argument "which spans nearly two uninterrupted pages of the report of proceedings." *Id.* ¶ 14. In denying the defendant's motion, the court referenced specific points made in the prosecutor's argument. *Id.* ¶¶ 15, 38.

¶ 100 On appeal, the Third District first rejected the State's contention that its participation in the inquiry was *de minimis*. *Id.* ¶ 38. The court then addressed the State's contention that any error was harmless because the trial court "ultimately relied upon its own observations in

32

denying [the] defendant's claims." *Id.* ¶ 39. Rather than consider whether the error was harmless on the record before it, the *Gore* court found that the State's argument was "foreclosed by the decision in *Jolly*, in which our supreme court rejected the notion that a *Krankel* inquiry conducted in adversarial fashion could be considered harmless error." *Id.*

¶ 101 We find the *Skillom* court's careful analysis of the question to be persuasive. We will therefore consider whether the error in this case was harmless.

¶ 102 In this case, the State participated in the inquiry by presenting an argument, but it did not question the defendant or defense counsel. The defendant's claims of ineffective assistance of counsel can be reviewed by looking at the record of the two trials and the statements of defense counsel during the *Krankel* inquiry, which, as noted, were not elicited by the State. As such, there is an objective record for us to review to determine whether the court correctly declined to appoint a new attorney and hold further hearings. As we have explained, this was the chief concern of the supreme court in *Jolly*.

¶ 103 This is not to minimize the fact that the State was permitted to argue against the defendant's position in a hearing where he appeared *pro se* without having waived the right to counsel. We find the error to be harmless under the circumstances of this case for two reasons. First, as just discussed, there is an objective record for this court to review. As we will discuss shortly, our review of that objective record leads us to conclude that the court ruled correctly.

¶ 104 Second, the record shows that the State's argument likely had little or no influence on the court's decision. Unlike what happened in *Gore*, the State did not offer any specific arguments in favor of defense counsel's performance that were not offered by counsel himself. Although the prosecutor argued that most of the arguments raised in the letter had to do with the strength of the evidence, rather than counsel's performance, the record indicates that the court was well

33

aware of this fact before hearing this argument. At times during the hearing, the defendant attempted to point out inconsistencies in the witness testimony and other weaknesses he saw in the State's evidence. Each time he did so, the court advised him that the sole purpose of the hearing was to evaluate his claims of ineffective assistance of counsel. Likewise, the court did not merely reiterate the prosecutor's assertion that defense counsel was a "tenacious opponent"; the court gave specific examples of counsel's performance that it could only have gleaned from conducting its own thorough review of the record. Thus, under the facts before us, we do not believe there is any possibility that the State's argument led the court to rule differently than it might have ruled had the prosecution not been given an opportunity to present it.

¶ 105 In summary, the State's participation in the preliminary inquiry, while inappropriate, did not prevent the court from creating an objective record for us to review and did not tip the balance against the defendant. Moreover, because our review of the objective record leads us to conclude that the court made the correct decision, it would make little sense to reverse this case and remand for further hearings at which the court would necessarily reach the same conclusion. For these reasons, we find that the error in this case was harmless beyond a reasonable doubt.

¶ 106 Krankel Inquiry and Ineffective Assistance of Counsel

¶ 107 The defendant's final contention is that the court erred in deciding not to appoint a new attorney and hold further hearings on his claims. Additional hearings and the appointment of a new attorney are not warranted unless the defendant's allegations are "sufficiently detailed" and challenge more than trial counsel's strategic decisions. *Fields*, 2013 IL App (2d) 120945, ¶ 21. However, if it appears that counsel may have neglected the defendant's case, the court should appoint new counsel and hold further hearings. *People v. Nitz*, 143 Ill. 2d 82, 134-35 (1991). As

34

stated previously, we will reverse the court's determination only if we find it to be manifestly erroneous. *Crutchfield*, 2015 IL App (5th) 120371, ¶ 20.

¶ 108   To support a claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was deficient and that the defendant suffered prejudice as a result. *People v. Edwards*, 195 Ill. 2d 142, 162 (2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). To establish that counsel's performance was deficient, a defendant must show that it fell below an objective standard of reasonable representation. *People v. Makiel*, 358 Ill. App. 3d 102, 105 (2005) (citing *Edwards*, 195 Ill. 2d at 162-63). To establish prejudice, a defendant must show that but for counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 105-06 (citing *Strickland*, 466 U.S. at 694). Counsel's performance enjoys a strong presumption that it was based on sound trial strategy. *Id.* at 106 (citing *Strickland*, 466 U.S. at 689).

¶ 109   Here, the defendant argued that counsel was ineffective for (1) failing to call Laqueshia Jackson and Angela Dodd as witnesses at his second trial, (2) failing to call two alibi witnesses, (3) failing to object to misstatements during the State's closing argument, and (4) failing to present evidence concerning the unreliability of the State's DNA evidence. We may quickly dispose of the defendant's claim that counsel was ineffective for failing to object during closing arguments. We have already concluded that only two of the challenged remarks were improper and that those two isolated comments were not prejudicial enough to warrant reversal because they did not contribute to the jury's verdict. In light of this conclusion, the defendant cannot meet his burden of demonstrating that it was reasonably probable that he would have been acquitted had counsel objected. As such, his claim of ineffective assistance of counsel based on those

remarks must fail. The defendant's remaining claims merit further discussion, and we address them in turn.

¶ 110   We first consider the defendant's claim that counsel was ineffective for failing to call Laqueshia Jackson in his second trial. At the *Krankel* inquiry, counsel told the court that he made a strategic decision not to call Jackson because she had indicated a willingness to testify for the State and he was uncertain as to what she would testify if called to the stand. The record of the defendant's first trial shows that this decision constituted sound trial strategy. As we discussed earlier, Jackson testified at the defendant's first trial that she saw the defendant get out of the mayor's vehicle, limp to another vehicle, and drive away. This was consistent with her statement to police, although she gave police conflicting statements about the second vehicle. Later, when Jackson was questioned outside the presence of the jury about the allegation that Detective McAfee offered her a bribe, she was visibly shaken and sobbed on the stand. Because of this, defense counsel had grave concerns about cross-examining her further in front of the jury. The same concerns would have been present had Jackson testified at the second trial. Thus, calling her as a witness would have been risky, even if counsel could have been certain that she would have given testimony helpful to the defendant.

¶ 111   Moreover, as discussed, counsel had reason to believe that Jackson would have again given testimony implicating the defendant. And even if she did change her testimony and claim that she did not see the defendant get out of the car, the State would have been able to use both her prior inconsistent statement to police and her inculpatory testimony from the first trial as substantive evidence against the defendant. See 725 ILCS 5/115-10.1 (West 2010). Thus, the decision not to call Jackson as a witness in the second trial constituted sound trial strategy.

36

¶ 112 The defendant also asserted that counsel was ineffective for failing to call Jackson's sister, Angela Dodd, as a witness in his second trial. During the defendant's first trial, Dodd called the court and claimed that she had witnessed McAfee offering Jackson a bribe. We acknowledge that defense counsel stated at the *Krankel* inquiry, more than three years later, that he only remembered talking to Dodd about Jackson's whereabouts. However, we have already found that counsel's decision not to call Jackson constituted sound trial strategy, and without Jackson's testimony, Dodd's testimony was not relevant to any issue in the case.

¶ 113 The court also rejected the defendant's claim that counsel was ineffective for failing to call two alibi witnesses. As discussed previously, counsel explained that he was unable to locate one witness and found that the second witness had no helpful information because he was intoxicated at the relevant time. We note that, in rejecting this claim, the court incorrectly stated that the second witness was intoxicated when counsel spoke to him. The court also emphasized, however, that the defendant did not allege that any uncalled witness would have offered testimony likely to have changed the outcome of the trial. See *Fields*, 2013 IL App (2d) 120945, ¶ 21 (noting that a trial court should reject an allegation of ineffective assistance of counsel if it is not sufficiently detailed). It is also worth reiterating that the defendant admitted to police in a recorded interview that he was at the scene of the crime. The defendant failed to show that calling any additional witnesses would have been reasonably likely to change the outcome of his trial.

¶ 114 The defendant's final claim of ineffective assistance of counsel relates to the DNA evidence. In determining whether the trial court correctly rejected this claim, we must consider counsel's handling of this evidence in its entirety. *People v. Watson*, 2012 IL App (2d) 091328, ¶ 32.

¶ 115   During cross-examination, defense counsel got Jay Winters to acknowledge that the partial profile obtained from the bloodstain on the defendant's jeans was not a "match" for John Thornton's DNA and that he could not be certain that it was Thornton's blood. Winters also acknowledged that DNA analysis cannot determine how or when the blood got on the defendant's jeans. Counsel elicited testimony from Winters that he did not test a swab taken from a bloodstain on the interior roof of the vehicle because he was not given permission to conduct tests that would consume the DNA in the swab, even though he acknowledged that his testing consumed all the DNA in the bloodstain on the defendant's jeans. Counsel also questioned Winters about the calculations he used to determine the frequency of the partial profile in the general population. Winters admitted that he performed one set of calculations earlier, which yielded a different result from the frequencies he testified to at trial. He acknowledged that the two sets of calculations were performed using the same profile. We note, however, that Winters also explained that he used different calculations due to an advancement in the testing process.

¶ 116   During closing argument, defense counsel reminded jurors that DNA in the blood was not a match. He argued, "They can't tell you that it's John Thornton's" blood. He also argued that it would be physically impossible for Thornton's blood to stain the part of the defendant's jeans where the stain was found if he was sitting in the car with Thornton when he was shot. Counsel explained that when a person wearing jeans is sitting, the jeans tend to bunch up around the area of the front pocket, where the blood was found. He also noted that the defendant was wearing a sweatshirt, which would have covered the part of the jeans where the bloodstain was located. (We note that there was conflicting evidence as to whether the defendant was wearing the sweatshirt or carrying it when he got out of the car.)

¶ 117   In arguing that counsel was ineffective, the defendant asserts that counsel should have presented additional evidence to show that the partial DNA profile was not reliable. In support of this contention, he cites *Watson* and *People v. Wright*, 2012 IL App (1st) 073106. The courts in both of those cases discussed studies demonstrating the limitations of partial DNA profiles. *Id.* ¶¶ 103, 111; *Watson*, 2012 IL App (2d) 091328, ¶¶ 25-26.

¶ 118   To understand the relevance of these discussions, we need to consider what DNA analysis entails. DNA analysts look for genetic variations in DNA, which are called alleles, at 13 loci. See *People v. Richmond*, 2017 IL App (1st) 150642, ¶ 6. As Jay Winters testified in this case, if the alleles at all of these loci match those in the known profile, the sample is considered a "match." When the profile is not complete at any of these loci, it cannot be called a "match." To calculate the frequency of a partial profile, DNA analysts use what is called the "product rule." This method involves multiplying the percentage of profiles in a database with the alleles found at the first locus by the percentage of profiles with the alleles found at the second locus—and so on—through all of the loci included in the partial profile. *Id.* ¶ 10. The product rule can yield "extraordinarily large figures" to estimate the probability of a partial profile occurring in a random unrelated individual. See *Wright*, 2012 IL App (1st) 073106, ¶ 84.

¶ 119   The studies discussed in *Wright* and *Watson* showed that searches of large DNA databases in Arizona, Illinois, and Maryland nevertheless revealed numerous pairs of unrelated individuals whose DNA profiles "matched" at nine loci. *Id.* ¶ 82.[4] However, as a panel of the First District recently explained, these searches yielded results that were consistent with the probability of random partial matches predicted by the product rule. *Richmond*, 2017 IL App

---

[4]A search of the Arizona database revealed 120 pairs of inmates with the same alleles at nine loci in a database of 65,493 inmates. *Wright*, 2012 IL App (1st) 073106, ¶ 11. In Illinois, there were approximately 900 such pairs in a database of more than 220,000. *Richmond*, 2017 IL App (1st) 150642, ¶ 21. In Maryland, 32 pairs of inmates had nine loci "matches" out of a database of 30,000. *Wright*, 2012 IL App (1st) 073106, ¶ 82.

(1st) 150642, ¶¶ 21, 23. Thus, the studies demonstrate that (1) a partial profile is less certain than a complete profile and (2) the statistical method used to calculate the probability of an unrelated individual having the same alleles in a partial profile is fairly accurate. This is consistent with the testimony Jay Winters gave in this case.

¶ 120    As discussed, defense counsel emphasized that the DNA profile in the bloodstain on the defendant's jeans was not a complete profile and that the State could not prove with certainty that the blood was John Thornton's. This is precisely what an attorney faced with similar DNA evidence must do to provide effective assistance. See *id.* ¶ 24; see also *Watson*, 2012 IL App (2d) 091328, ¶ 31 (noting that "the well-established fact that the police routinely test DNA evidence at 13 loci is the only information needed to make a basic argument that the fewer loci available for testing the less certain the results might be").[5]

¶ 121    Before the trial court, the defendant asserted that counsel should have presented additional evidence to challenge the reliability of the partial profile. He did not specify what additional evidence counsel should have presented. We note, however, that a competent attorney might well choose not to present evidence such as the studies discussed in *Wright* and *Watson* because the complex statistical analysis involved in those studies could be confusing to most jurors and the evidence may not be very helpful. *Richmond*, 2017 IL App (1st) 150642, ¶ 24.

¶ 122    On appeal, the defendant points out that Winters never testified to how many loci he was able to analyze. He argues that counsel should have questioned Winters about this. We recognize that this would have been an appropriate and potentially helpful line of inquiry. Had Winters said that the profile included alleles at only four or five loci, defense counsel could have highlighted

---

[5]We acknowledge that, in *Wright*, a division of the First District found that defense counsel was ineffective for failing to introduce evidence of the results of the search of the Illinois prisoner database, results he had successfully requested in another case. *Wright*, 2012 IL App (1st) 073106, ¶¶ 103-115. However, that case involved unusual circumstances not present here. Moreover, a different panel of the First District has rejected the *Wright* court's holding. *Richmond*, 2017 IL App (1st) 150642, ¶ 23.

this weakness during closing argument. However, it is worth noting that this would not have altered or contradicted Winters' testimony concerning the probability of the blood coming from someone other than Thornton. Moreover, the effective assistance to which a defendant is entitled requires that counsel provide competent representation, not perfect representation. *People v. Easley*, 192 Ill. 2d 307, 344 (2000). We find that defense counsel's representation met this standard with respect to the DNA evidence as well as the other areas challenged by the defendant. As such, we find no clear abuse of the trial court's discretion in its decision to reject his claims.

¶ 123                                    CONCLUSION

¶ 124   For the foregoing reasons, we affirm the defendant's conviction.

¶ 125   Affirmed.

2018 IL App (5th) 150274

NO. 5-15-0274

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 10-CF-425 |
| | ) | |
| AARON JACKSON, | ) | Honorable |
| | ) | John Baricevic, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**     **September 11, 2018**
_____

**Justices:**     Honorable Melissa A. Chapman, J.

Honorable John B. Barberis, P.J., and
Honorable Richard P. Goldenhersh, J.,
Concur

_____

**Attorneys**     Michael J. Pelletier, State Appellate Defender, Jacqueline L. Bullard,
**for**     Deputy Defender, Susan M. Wilham, Assistant Appellate Defender, Office
**Appellant**     of the State Appellate Defender, Fourth Judicial District, 400 West
Monroe Street, Suite 303, P.O. Box 5240, Springfield, IL 62705-5240

_____

**Attorneys**     Hon. Brendan F. Kelly, State's Attorney, St. Clair County, 10 Public
**for**     Square, Belleville, IL 62220; Patrick Delfino, Director, David J.
**Appellee**     Robinson, Acting  Deputy Director, Chelsea E. Kasten, Staff Attorney,
Office of the State's Attorneys Appellate Prosecutor, Fifth District Office,
730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____