2020 IL App (1st) 180946-U

No. 1-18-0946

Order filed August 11, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 5034 |
| | ) | |
| ROBERT BARNES, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction and sentence, finding (1) the trial court properly answered the jury's request for a definition of reasonable doubt; and (2) remand for further proceedings pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) is not warranted.

¶ 2    Following a jury trial, defendant Robert Barnes was convicted of, *inter alia*, two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1), (4) (West 2012)), and one count of aggravated kidnapping (720 ILCS 5/10-2(a)(3), (5) (West 2012)). He was sentenced to an

aggregate 80-year prison term: 35 years' imprisonment on each of the aggravated criminal sexual assault counts and 10 years' imprisonment for aggravated kidnapping, with all terms to be served consecutively. On appeal, defendant contends (1) the trial court erred when it failed to define "reasonable doubt" despite a specific jury request to do so; and (2) the matter should be remanded for further proceedings pursuant *People v. Krankel*, 102 Ill. 2d 181 (1984). We affirm.

¶ 3      Prior to trial, the State filed a motion to allow proof of other crimes evidence pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2014)). In the motion, the State sought permission to admit evidence of four other sexual assaults committed by defendant. The trial court ruled that the State could present evidence of two of the four other assaults to show identity, intent, motive, lack of consent, *modus operandi*, common scheme or design, and propensity to commit sexual assault.[1]

¶ 4      The State began its opening statement at trial by asserting, "[y]ou are sitting in the company of a rapist. That is who [defendant] is and what he does. The defendant roam[s] our city streets looking for women alone and then he viciously rapes them." The State concluded by stating, "the defendant is a rapist. That is who he is and what he does, and he is guilty as charged." Defense counsel did not object.

¶ 5      The evidence presented at trial showed that on February 3, 2013, between 11:00 p.m. and 12:00 a.m., J.H. left her home and walked to a convenience store located two blocks away to get a sandwich. On her way back home, she was approached at the back of her house, "grabbed from the back . . . and forced in a truck."

---

[1] At trial, the State presented evidence of only one of the other assaults.

¶ 6　　At trial, J.H. identified the defendant as the person who grabbed her from behind with his right arm while holding a knife with a three-inch blade in his left hand. Defendant forced her inside his truck, which was parked next to her home. He told her not to look at him and threw her glasses in the backseat of the truck. While still holding the knife, he told her to "take off [her] clothes." In response, she "just did what [she] had to do" and "took off [her] clothes all the way down to her socks."

¶ 7　　Defendant forced J.H. to perform oral sex on him, and he ejaculated into her mouth. He instructed her to swallow his semen and to take a drink of vodka. He then got on top of her and placed his penis in her vagina. He did not wear a condom, and "probably" ejaculated inside of her vagina. Next, he forced her to turn around and get on her knees, and "inserted his penis into [her] from the back."

¶ 8　　After he assaulted her from behind, J.H. asked defendant for her clothes, but defendant, still holding the knife, said she "had to give him oral sex again." When he was finished, he told her to get out of the truck. As she got out, defendant threw her clothing out the passenger-side window and told her that he "would come back to kill [her]" if she looked at his license plate. After he drove away in the truck, she "grabbed all her stuff and ran into the house" and "told her mom what had just happened."

¶ 9　　The police arrived at J.H.'s house, and she provided them with a description of defendant. The police then took her to the University of Chicago Medical Center, where she spoke with detectives and was examined by doctors and nurses. A criminal sexual assault kit was administered at the hospital.

¶ 10     J.H. was not contacted by the police again until several years later. On March 5, 2015, she viewed a photo array and identified defendant as the man who assaulted her on February 3, 2013.

¶ 11     Jennifer Wagenmaker and Jennifer Belna, both forensic scientists with the Illinois State Police (ISP), testified at trial. Wagenmaker examined J.H.'s criminal sexual assault kit, which included vaginal, oral and anal swabs, and discovered semen on the swabs. Belna received the samples collected from the criminal sexual assault kit and conducted a deoxyribonucleic acid (DNA) analysis on the kit. The oral and anal swabs contained a sufficient amount of male DNA to identify a profile which matched the DNA profile of the defendant.

¶ 12     T.B. testified that, on April 29, 2010, she planned to take the Metra train to the Greyhound bus station to return to Central State University College in Ohio after having been home for the weekend. On her way to the Metra station, she stopped at a currency exchange to load her prepaid debit card so she could buy her bus ticket. After she left the currency exchange, defendant, who she identified in court, exited a four-door, light-colored car with a knife in his hand and ordered her to "get in the car." Defendant placed the point of the knife in her left ear, told her he had been watching her, and demanded her money. He told her "[i]f you don't give me your money, I'm going to push the knife all the way through [your ear]." After T.B. fearfully entered the defendant's car on the passenger side, he got back in and drove to an underground parking lot.

¶ 13     Defendant parked the car, punched T.B., pulled her hair, ordered her to take off her shirt and lift her bra, and said "I know you got some money on you." T.B. complied but defendant did not find her money because she had concealed it in a hidden pocket in her jacket. Defendant then told T.B. "to suck his dick." T.B. refused and defendant threatened to kill her.

¶ 14    T.B. asked defendant if he would put on a condom, because she was pregnant, and defendant told her "no *** I'll put one on when I go inside of you." T.B. put her mouth on defendant's penis against her will. Defendant then told her to take off her pants, climbed across the seat, put a condom on, told her to bend over on the seat, placed his penis into her vagina from behind and "raped [her]." After the assault, the defendant told T.B. "to fix herself before she got out of the car." When she got out of the car, she saw and "remembered the license plate."

¶ 15    T.B. left the underground parking lot, called 911, told the police what had happened and gave them the license plate number. The police took her to St. Francis Hospital, where a criminal sexual assault kit was administered.

¶ 16    T.B. had no further contact with the police until almost five years later. On March 4, 2015, she was contacted by a Chicago police detective, viewed a photo array, and identified defendant as the man who "raped [her]" on April 29, 2010.

¶ 17    Defendant testified that he first encountered J.H. at approximately 3 p.m. on February 2, 2013, at a gas station on the corner of East Garfield Boulevard and South Wabash Avenue. Defendant pulled into the gas station, driving a 2001 Ford Taurus, and saw J.H. leaving with a six- or seven-year-old girl. Defendant "liked what [he] saw" so he engaged her in a conversation. After their conversation, defendant left the gas station alone.

¶ 18    Later that night, J.H. texted defendant asking if he wanted to "hang out." He drove to her house at about 8:30 p.m., and she got into his Taurus. The two drove around, "hanging out, getting high, [and] drinking." Eventually, the two stopped to get more "weed," then drove back to J.H.'s house and, about midnight, parked in the back of the house. J.H. did not exit defendant's car right away; instead, "[s]he sat back there in the back smoking blunts and drinking."

¶ 19    Defendant asked J.H. for sex, and J.H. told him, "I hope you don't think you're going to get no sex just for this weed[.]" Defendant asked her what she wanted, and she replied she wanted $40. Defendant gave her $20, and they had consensual sex. When defendant refused to go to an automated teller machine (ATM) to get the other $20, J.H. left his car "mad but fully dressed."

¶ 20    With respect to T.B., defendant testified he first met her back in 2010 when she was "coming down Clark [Street] and Lunt." He was looking for a prostitute at the time. He pulled his car beside T.B. and asked what she was doing. T.B. got into defendant's car and asked him if he was the police, and defendant told her "no." He and T.B. drove to a covered parking area, where he gave her $25 and they had consensual sex.

¶ 21    Defendant denied forcing T.B. into the car at knifepoint. When they finished having sex, T.B. "got mad because she wanted another $25." Defendant told her he did not have it and "it wasn't worth $50." After pulling out a razor blade and trying to attack him, she left the car. The police questioned him about this incident, but he was not arrested at that time.

¶ 22    Defendant testified that he was convicted of aggravated fleeing and eluding in 2013. Because he was on parole at the time of his arrest in this case, he was taken back into Illinois Department of Corrections (IDOC) custody. While in custody awaiting trial, defendant wrote to Phyllis Lewis, his longtime girlfriend and the mother of his children, stating "Babe . . . I need you to lie for me" in this case. He addressed his alibi request to "Ms. Phyllis Lewis, Attorney at Law" so that the authorities would not discover the ruse.

¶ 23    In its closing argument, the State asserted that the "trail of evidence in this case leads to only one place, to where [T.B.'s] and [J.H.'s] rapist sits across this courtroom from you today." The defense argued that "you heard some things that probably led you to believe that you might

not like Mr. Barnes . . . he frequents prostitutes . . . he's been in prison before . . ." In rebuttal, the State argued, "[c]ounsel told you that the defendant is a lot of things. He's right. He's a liar, he's a cheater and he's a rapist."

¶ 24    The trial court instructed the jury, in relevant part, that (1) defendant was to be presumed innocent of the charges against him and that presumption was "not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty"; and (2) the State had the burden of proving defendant's guilt beyond a reasonable doubt, and that burden remained on the State throughout the case.

¶ 25    During its deliberations, the jury sent out a note asking the trial court to, "opine on the difference between the subjective and legal standard in defining reasonable doubt?" Our supreme court "has long and consistently held that neither the trial court nor counsel should define reasonable doubt for the jury." *People v. Downs*, 2015 IL 117934, ¶ 19. The trial court correctly relied on *Downs* in concluding that the jury's question should be answered by instructing that "We cannot give you a definition; it is your duty to define." After both sides indicated they had no objection to the court's proposed response, the jury was so instructed.

¶ 26    The jury found defendant guilty of four counts of aggravated criminal sexual assault and two counts of aggravated kidnapping. On the date set for presentation of defendant's motion for new trial, defendant informed the trial court he wished to proceed *pro se* and file his own motion for new trial. Defendant filed two *pro se* motions, one entitled "Motion To The Presiding Judge, Leroy K. Martin, JR" and the other "Motion for a New Trial."

¶ 27    In the two motions, collectively, defendant asserted a claim of ineffective assistance based on various alleged defects in defense counsel's performance. Relevant here, defendant alleged

counsel's failure to object to the state's characterization of him as a "rapist" during it's opening statement and closing arguments and counsel's failure to investigate the crime scene or the victim's background.

¶ 28    Pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) and its progeny, the court continued the matter to conduct a preliminary inquiry into the factual basis of the claims to determine whether appointment of new counsel to represent defendant was warranted.

¶ 29    At the next court date, the trial court explained the procedure for a preliminary *Krankel* inquiry to defendant, informing him it would allow him to set forth the bases for his claim, would ask questions of him and defense counsel if necessary, and then, if there was a *prima facie* showing that counsel's performance was ineffective, new counsel would be appointed to represent him.

¶ 30    With respect to his ineffective assistance of counsel claim, defendant argued that counsel's failure to object to the State's characterization of him as a "rapist" improperly violated his right to a fair trial. Defendant also argued that counsel's failure to investigate the crime scene denied him the ability of showing that the store J.H. allegedly visited before the assault did "not even exist *** at that location."

¶ 31    When asked to explain his failure to object to the State's characterization of defendant as a "rapist," defense counsel said he "was confused" and "didn't think [the ASA] called [defendant] a rapist." In addition, he did not think it was proper to interrupt the ASA because criminal sexual assault is colloquially referred to as rape, and an objection would have been antithetical to his trial strategy. Concerning defendant's allegation that counsel failed to investigate the crime scene, counsel stated it was "not clear in the reports what specific deli [J.H.] was even referring to" or how "investigating the crime scene would have assisted [him] in the trial." Defendant interjected,

"[i]t woulda [*sic*] showed she was lying." Counsel responded that the defense was consent and this was a cold case, so store security camera footage would not have been preserved, and the State had photographs of the crime scene.

¶ 32    The trial court denied defendant's request for the appointment of new counsel for posttrial proceedings. The court found that the State's comments during opening statements and closing arguments were not so inflammatory or prejudicial as to warrant relief, the State properly commented on the evidence in the case, and the failure to object did not meet the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984). Regarding counsel's failure to investigate the crime scene, the court was "not exactly sure what the nexus [was] with regard to this . . . possibly [to] impeach the witness on some collateral issue." Since the defense was consent, the court did not believe that further investigation of the crime scene would have affected the jury's consideration of the evidence. The court concluded that counsel's professional performance was not deficient, and "the *Strickland* standards" had not been established.

¶ 33    Defendant then filed another *pro se* motion for new trial, in which he asserted, *inter alia*, counsel was ineffective because "the blood was never tested for drugs which the defendant told [defense counsel] to do, it would have proving [*sic*] that [J.H.] was getting high with the defendant on (weed-cannabis)."[2]

¶ 34    In response, the court found that defendant's latest allegation did not meet the *Strickland* standard. Although the court indicated it had read the motion, counsel's alleged failure to test J.H.'s blood was not specifically addressed. The court asked defendant whether there was anything else he wanted to address, to which defendant responded, "that's it." The court pressed further

---

[2] The record does not contain a file-stamped copy of defendant's second motion for a new trial.

whether there was "anything else" he wanted to raise, and he indicated there was not. The court denied the motion.

¶ 35    Defendant was sentenced to 35 years' imprisonment on two of the aggravated criminal sexual assault charges and 10 years' imprisonment on one count of aggravated kidnapping, the sentences to be served consecutively, for an aggregate term of 80 years' imprisonment. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 36    On appeal, defendant first contends the trial court erred in failing to provide the jury with a definition of reasonable doubt. According to defendant, "[b]y instructing the confused jury that it was free to make up a definition of reasonable doubt, the trial court's response created a reasonable probability that the jury did not apply the correct standard in deliberations."

¶ 37    The State asserts that defendant acquiesced to the error by specifically agreeing to it being given. We agree.

¶ 38    It is well settled "a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." (Internal quotation marks omitted.) *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 52. In other words, a party cannot complain of a purported error which that party induced the court to make or to which that party consented. *Id.*

¶ 39    Here, the trial court specifically asked the parties whether they objected to the jury being instructed that: "[w]e cannot give you a definition; it is for you to define." By answering that he had "no objection," defendant acquiesced to the purported error of which he now complains. See *Lawrence*, 2018 IL App (1st) 161267, ¶ 53; *People v. Caffey*, 205 Ill. 2d 52, 113-14 (2001) (when the trial court asked defense counsel whether he had any objection to the State playing a 911 tape

and counsel responded he did not have an objection, the defendant thereby acquiesced to the admission of the tape); *People v. Cox*, 2017 IL App (1st) 151536, ¶¶ 72-75 (invited error doctrine barred the defendant's claim on appeal with respect to admission of hearsay evidence where defense counsel stated he had "no objection" to its admission at trial). Moreover, as the trial court correctly understood in this case, "Illinois is among the jurisdictions that do not define reasonable doubt for the jury." *People v. Downs*, 2015 IL 117934, ¶ 19.

¶ 40    Defendant next contends this matter should be remanded for further proceedings pursuant to *Krankel*, 102 Ill. 2d 181. According to defendant, the trial court erred by failing to (1) inquire into his claim that counsel failed to investigate whether J.H.'s hospital blood tests revealed the presence of cannabis; and (2) appoint new counsel where two of his claims showed possible neglect, therefore warranting further proceedings under *Krankel*. We disagree.

¶ 41    Although the principles set forth in *Krankel* are triggered when a defendant makes a *pro se* posttrial claim of ineffective assistance of counsel (*People v. Jolly*, 2014 IL 117142, ¶ 29), the trial court does not automatically appoint new counsel to represent the defendant. *Id.* If, as occurred in the instant case, the court determines during the preliminary inquiry that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *People v. Moore*, 207 Ill. 2d 68, 78 (2003).

¶ 42    In making the inquiry into the factual basis for the defendant's claim, the trial court may engage in some interchange with trial counsel about the facts and circumstances surrounding the defendant's allegations, and it may briefly discuss the allegations with the defendant. *Jolly*, 2014 IL 117142, ¶ 30. The court may "base its evaluation of the defendant's *pro se* allegations of

ineffective assistance of counsel on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78.

¶ 43 Our concern on appeal is whether the trial court conducted an adequate inquiry into the defendant's allegations. *Id.* The goal of the inquiry "is to facilitate the trial court's full consideration of a defendant's *pro se* claims and thereby potentially limit issues on appeal." *People v. Ayres*, 2017 IL 120071, ¶ 13.

¶ 44 The standard of review we apply depends on the type of claim a defendant raises on appeal. Where the defendant contends the trial court did not conduct an adequate *Krankel* inquiry, our review is *de novo*. *Roddis*, 2020 IL 124352, ¶ 33. If, on the other hand, the court addresses the merits of the defendant's claim and declines to appoint counsel for further proceedings, we review the court's determination for manifest error. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25.

¶ 45 Relying on *Moore*, 207 Ill. 2d at 78 and *Ayres*, 2017 IL 120071, ¶ 24, defendant contends the trial court committed reversible error when it "failed entirely to inquire into [defendant's] claim . . . that counsel did not investigate whether J.H.'s hospital blood tests revealed the presence of cannabis, evidence that would have corroborated [defendant's] testimony that he and J.H. smoked blunts together" on the night of the offense. Since defendant claims the *Krankel* inquiry was inadequate, our review is *de novo*. *Roddis*, 2020 IL 124352, ¶ 33.

¶ 46 In *Moore*, 207 Ill. 2d at 78, "the trial court conducted no inquiry of any sort into defendant's allegations of ineffective assistance of counsel. Indeed, the record [did] not show whether the trial court ever read defendant's *pro se* posttrial motion." Similarly, in *Ayres*, 2017 IL 120071, ¶ 24, "the circuit court never addressed defendant's petition." In the instant case, the record establishes

that the trial court reviewed defendant's second *pro se* posttrial motion and was in a position to evaluate "the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79.

¶ 47    We reiterate that the purpose of a *Krankel* inquiry is to ascertain the factual bases which underlie the defendant's claims and afford him the opportunity to explain and support those claims. See *Ayres*, 2017 IL 120071, ¶¶ 13, 24. The method a trial court may employ to achieve this goal is "somewhat flexible." See *People v. Jackson*, 2018 IL App (5th) 150274, ¶ 84, *aff'd* 2020 IL 124112. Contrary to defendant's position, a trial court is not required to orally review each and every claim contained in the defendant's *pro se* motion, line by line, and memorialize it for the record. Rather, the trial court must simply "afford [the] defendant an opportunity to explain and support his claim[s]." *Ayres*, 2017 IL 120071, ¶ 24. In this case, the record establishes that the defendant was provided a sufficient opportunity to do so.

¶ 48    Finally, defendant argues the trial court erred by failing to appoint new counsel where two of his claims—counsel's failure to (1) object to the State's characterization of him as a "rapist" at trial, and (2) investigate the deli which J.H. patronized prior to her encounter with defendant—showed possible neglect. We disagree.

¶ 49    After considering the merits of each of these claims, the court held that the appointment of new counsel was not warranted. We will not reverse the court's decision unless it was manifestly erroneous. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25. A decision is manifestly erroneous when the error "is clearly plain, evident, and indisputable." *Id.*

¶ 50    When evaluating a claim of ineffective assistance of counsel, courts apply a two-prong test under which the defendant must prove his counsel's performance fell below an objectively reasonable standard and the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687;

*People v. Caballero*, 126 Ill. 2d 248, 259-60 (1989). The defendant must show counsel's performance was both objectively unreasonable under prevailing professional norms and there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Veach*, 2017 IL 120649. Because a defendant must meet his burden on both the performance and prejudice prongs, courts may resolve ineffective-assistance claims by deciding only the prejudice prong. *People v. Perry*, 224 Ill. 2d 312, 342 (2007).

¶ 51    Assuming, *arguendo*, counsel's performance was deficient, defendant cannot establish that, but for counsel's errors, the result of the proceeding would have been different. The overwhelming evidence against defendant in this case included the compelling testimony of two victims who testified they were viciously attacked by defendant in a similar manner, DNA evidence linking defendant to the assault of J.H. and his own admission that he attempted to persuade the mother of his children to lie for him at trial. The record supports the trial court's determination that defendant's claims failed to meet the *Strickland* standard and did not warrant the appointment of new counsel for further *Krankel* proceedings. We therefore find that the court's decision was not manifestly erroneous.

¶ 52    For the reasons stated, we affirm the judgment of the trial court.

¶ 53    Affirmed.