NOTICE
Decision filed 09/21/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200217-U

NO. 5-20-0217

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Shelby County. |
| | ) | |
| v. | ) | No. 15-CF-176 |
| | ) | |
| MICHAEL A. HARDING, | ) | Honorable |
| | ) | Kimberly G. Koester, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's conduct of a preliminary *Krankel* inquiry was proper where the court gave the defendant ample opportunity to present a factual basis for his *pro se* claims of ineffective assistance of counsel, the State did not participate in the proceedings in an adversarial manner, and the record affirmatively refutes his claims.

¶ 2    The defendant, Michael A. Harding, was convicted of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)). He filed a *pro se* motion for a reduction of his sentence, which contained allegations of ineffective assistance of counsel. Following a preliminary *Krankel* inquiry (*People v. Krankel*, 102 Ill. 2d 181 (1984)), the trial court denied the defendant's motion without appointing a new attorney to further develop his claims. The defendant appeals that ruling, arguing that the court did not conduct the hearing in a neutral and nonadversarial manner. We affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      In November 2015, the defendant was charged with predatory criminal sexual assault of a

child (720 ILCS 5/11-1.40(a)(1) (West 2014)). Attorney Walter Lookofsky was retained by the

defendant's mother to represent him.

¶ 5      The matter came for trial in July 2017. During jury selection, the court asked the first group

of prospective jurors to raise their hands if they had heard or read anything about the case from

any source. The court explained, "that could be through radio, newspaper, even social media."

Only one juror in the first group raised his hand. Addressing that juror, the court asked, "Mr.

Thompson, I am not asking you what you did hear, but I am asking how did you hear about this

case, sir?" Thompson explained that his son-in-law is with the Shelby Police Department. When

asked if his son-in-law had discussed with him the details of the case, Thompson replied,

"Somewhat." In response to further questions from the court, Thompson indicated that although

he had not already formed an opinion as to the defendant's guilt or innocence, "[i]t would be hard"

for him to put aside his son-in-law's comments and decide the case based solely on the evidence.

Subsequently, Thompson was questioned by the attorneys and dismissed for cause.

¶ 6      In addressing the second panel of prospective jurors, the court similarly asked, "Have you

heard or read anything about this case? I am not asking what you did read or hear, but if you have

heard about this case before today, either through newspapers, radio, or social media, or any other

form, please raise your hand." None of the prospective jurors raised their hands.

¶ 7      After trial, the jury returned a verdict of guilty. The court subsequently sentenced the

defendant to 20 years in prison.

¶ 8      On November 21, 2017, the defendant filed a motion to reconsider sentence through

counsel. In it, he argued that the court failed to give adequate consideration to the "substantial

evidence of factors in mitigation" presented by the defendant. On November 29, he filed a *pro se* "motion for sentence reduction," arguing that (1) he was actually innocent of the offense, (2) not all evidence for the defense was presented, (3) defense counsel failed to conduct a "complete investigation," and (4) the State presented false testimony against him.

¶ 9 On February 14, 2018, the court held a hearing on both motions. In addressing the motion filed through counsel, the trial judge stated that although she did not find any statutory factors in mitigation to be applicable when sentencing the defendant, she did take into consideration the evidence in mitigation presented by the defendant at the sentencing hearing. In addressing the *pro se* motion, the court found that there was no evidence in support of the defendant's claims that he was innocent or that any witness testified falsely. The court therefore denied both motions.

¶ 10 The defendant filed an appeal with this court, arguing that the trial court erred in failing to conduct any inquiry into the defendant's *pro se* claims of ineffective assistance of counsel, as required by *Krankel*. The State conceded that the trial court erred, and this court agreed. We therefore remanded the matter to the trial court for the limited purpose of holding a preliminary *Krankel* inquiry.

¶ 11 The court held a preliminary *Krankel* inquiry in June 2020. Because the defendant challenges the manner in which the court conducted that inquiry, we will set forth what occurred in detail.

¶ 12 The court began by telling the defendant, "So, Mr. Harding, this is your opportunity to present any evidence or make any arguments to the court as to why you believe Mr. Lookofsky failed to do something in your case that you believe amounts to the—to ineffective assistance of counsel." The court then swore the defendant in before allowing him to present his claims.

¶ 13    The defendant stated as follows: "Well, in the beginning, he could have checked my background and argued [special prosecutor] Ms. Lamken's saying that it was a felony for previous charges that was actually a misdemeanor. And he didn't ask the questions that, in the beginning, I explained to him that [he] needed to ask."

¶ 14    The court asked the defendant to clarify what questions he believed counsel failed to ask and which witnesses should have been asked those questions. The court further asked the defendant to explain "what evidence would have been elicited from those questions that would have potentially changed the outcome of the jury trial."

¶ 15    In response, the defendant stated that counsel should have asked "the supposed victim" about an incident in which she demanded that the defendant convince her mother to remain in Illinois "or else." When asked to explain how this might have changed the jury's verdict, the defendant noted that after the victim made this alleged threat, "all of a sudden [he] was charged and put in jail for this." The defendant also asserted that counsel failed to question the victim about her mother telling her that the defendant was her biological father, rather than her cousin. When asked how these questions might have influenced the jury's decision, he replied, "I understand that she's upset and confused about, you know, finding out that her dad ain't really her dad and you know, I understand that."

¶ 16    The defendant continued to speak, unprompted. In pertinent part, he stated, "[I]t was also put in the newspaper before I had a trial that I was guilty of three different charges, like I was already guilty before the jurors were even picked." The defendant then asserted that one of the prospective jurors had the last name Goodrich, which was the victim's mother's maiden name. He indicated that he told his attorney that the juror might be related to the victim and her mother. (We note that prospective juror Goodrich did not serve on the jury in this case.) The court asked the

4

defendant if he was aware that every potential juror was asked whether "they know any of the persons in the case and if they have any knowledge of the case." The defendant replied, "Right."

¶ 17 The defendant then stated, "I still think the jury was tainted before they were picked." Asked to explain, he stated that all of the prospective jurors heard one prospective juror say that he could not be fair and impartial because of what he had heard about the case. The following discussion then took place:

"THE COURT: But he never said anything about why he couldn't do that, right?

THE DEFENDANT: He said because his—his son-in-law was under deputy sheriff.

THE COURT: And so he said he had some—

THE DEFENDANT: So somebody had been talking.

THE COURT: Uh-huh. Okay. And he wasn't selected for the jury, correct?

THE DEFENDANT: Right. But the other potential jurors heard that.

THE COURT: They heard that he had knowledge and that he could not be a fair juror.

THE DEFENDANT: Right."

¶ 18 The court then asked the defendant, "Anything else, sir?" In response, the defendant indicated that the arresting officer, Carissa Smith, gave "conflicting answers" in her testimony. Specifically, he asserted that she testified that she was "highly trained" for handling this type of case, but she could not recall who had trained her. In addition, the defendant noted that although Smith testified that she conducted a thorough investigation, he believed there was evidence that was not uncovered or presented at trial.

¶ 19 The court asked the defendant, "Anything else, Mr. Harding?" The defendant explained that the Shelbyville newspaper ran an article in which prosecutor Lorinda Lamken was quoted as

5

stating that the defendant was "guilty in three states for various crimes," including the charge in this case. He emphasized that this article appeared before the jury was selected.

¶ 20    When asked again if there was anything else, the defendant repeated his accusation about the victim threatening him, alleging that she said, "Make my mom stay or else." He then alleged that the public defenders are overworked and that he felt his attorney could have done more for him. The court asked, "What else do you think he could have done?" The defendant replied, "He could have argued better. He could have explained that there was in fact doubt ***." The defendant also alleged that his attorney did not keep in contact with him.

¶ 21    The defendant went on to argue that counsel should have countered the prosecution's argument that a Pennsylvania conviction for which he spent five years in prison was a felony. The court pointed out that the defendant's Pennsylvania conviction was brought up at the sentencing hearing, not at trial. The court asked, "What was [counsel's] ineffective assistance of—at trial?" In response, the defendant reiterated his earlier arguments about counsel's failure to ask various questions of the victim. The court asked again, "Anything else?" to which the defendant replied, "Not that I can think of off the top of my head."

¶ 22    At this point, the court questioned defense counsel Lookofsky. As the defendant notes in this appeal, the court did not require Lookofsky to be sworn in as a witness.

¶ 23    The court first asked Lookofsky to clarify the defendant's argument about his Pennsylvania conviction. The court specifically asked whether the issue came up during trial. Lookofsky explained that it was his understanding that the defendant spent "several years in prison" in Pennsylvania. He noted that the issue of the prior conviction came up at sentencing, and that although he could not recall whether it also came up at trial, he did not believe it did.

¶ 24    Lookofsky was next asked to address the defendant's allegation that the defendant may have been the victim's father. Lookofsky indicated that he was "aware that that was a possibility." He explained, however, that he believed eliciting testimony about this at trial would have been more likely to harm than help the defendant.

¶ 25    Turning to the defendant's allegations concerning newspaper coverage, the court specifically asked Lookofsky whether he remembered the court asking prospective jurors whether they knew anything about the case and, if so, whether that would prevent them from being fair and impartial. Lookofsky confirmed that he recalled these questions being asked. He stated that he did not think any of the jurors selected said that they had heard anything about the case from media coverage.

¶ 26    Lookofsky was next asked about Carissa Smith's testimony. He stated that he did not specifically remember her testifying that she did not recall the name of the individual who had trained her. He explained, however, that the name of the individual who trained her would not have had any impact on his defense.

¶ 27    When asked how often he met with the defendant, Lookofsky explained that he met with both the defendant and his mother. He noted that he met with the defendant's mother "probably once every week or every two weeks." He indicated that at some of these meetings, the defendant's mother had messages for him from the defendant. Lookofsky stated that he also met with the defendant, although he did not recall precisely how often they met. He noted that he "probably" had fewer meetings with the defendant than his mother.

¶ 28    The court next asked Lookofsky to address the defendant's allegations that the victim threatened him and demanded that he get her mother to stay in Illinois. Lookofsky stated that both the defendant and his mother raised this issue with him. He told the court that he attempted to elicit

testimony on this issue, but he explained that the victim was "from the defense point of view, she was a terrible witness." As a result, Lookofsky decided to limit his cross-examination in order to "get her off the witness stand" as soon as possible because her testimony was damaging to the defendant, even on cross-examination.

¶ 29 The court next asked the defendant, "Mr. Harding, do you have any other questions or areas that you believe I need to inquire of Mr. Lookofsky?" The defendant replied, "I just still think he should have asked the question about when she threatened me ***. You know, I really—I really feel right there was pretty crucial." Asked to explain, the defendant indicated that if questioned, the victim "could have answered whether she was telling the truth or not or she—just because she was mad because I didn't make her mom stay."

¶ 30 The court then ruled from the bench, addressing each of the defendant's allegations. The court first noted that any inaccurate information about the defendant's previous criminal history would not have changed the outcome of the trial because it was presented at sentencing, not at trial. The court then noted that Lookofsky's decision not to question the victim about her knowledge that the defendant might be her father or her alleged threats to the defendant were decisions involving matters of trial strategy.

¶ 31 The court addressed the defendant's allegations concerning the newspaper article, stating, "I've not seen any of those newspapers. And so I don't have any specific language that he's referring to." The court noted, however, that the court and both attorneys had the opportunity to question prospective jurors concerning any prior knowledge they had about the case and whether that knowledge would prevent them from being fair and impartial jurors.

¶ 32 The court went on to address, more generally, the defendant's allegations concerning jurors' knowledge of the case. The court stated as follows:

8

"The one juror that you did point out to the Court advised the Court that he in fact did have prior notice, and that prior information or notice would have prevented him from being a fair and impartial juror. That's what *voir dire* is. *Voir dire* is to in fact find out who might have heard about the case; and if they had heard about the case, would that make it impossible for them to serve as a fair and impartial juror. This Court never has and never will ask them in front of the other jurors what that information—particular information is, as it could poison the rest of the jury panel. And in this case, I am confident that the Court followed that same procedure, and that no information was elicited from this potential juror that would have harmed you, nor is there any allegations or information presented to me today that Mr. Lookofsky failed to protect you from having any inappropriate information going to the rest of the prospective jurors."

¶ 33 The court next addressed the defendant's claim that counsel was ineffective for failing to cross-examine Carissa Smith about her inability to recall the name of the person who trained her. The court noted that while this "may have gone to her credibility," counsel's decision that it was not important was a matter of trial strategy.

¶ 34 In addressing the defendant's claims that public defenders are overworked and that his attorney did not consult with him on a regular basis, the court noted that Lookofsky was retained by the defendant's mother, making his argument about the workload of public defenders irrelevant. The court further noted that Lookofsky specifically stated that he did consult with the defendant.

¶ 35 After addressing each individual claim, the trial judge explained that because she had found that all of the defendant's claims either lacked merit or involved matters of trial strategy, she would deny the defendant's motion. The defendant interjected, asking, "Even if I didn't address any—a

9

couple other things that I forgot or does it matter?" In response, the court gave the defendant an opportunity to present any additional arguments he might have.

¶ 36    The defendant raised one new claim. He alleged that a recording video containing four statements was sent to the jury room even though the jury only saw one of those statements in court. The court asked both attorneys to clarify. Lorinda Lamken, the prosecutor, explained that although three other children were interviewed, only the victim's testimony was presented at trial, and there was no motion to admit hearsay statements made by the other children. She asked defense counsel, Lookofsky, if he remembered "what was actually admitted" into evidence or sent to the jury. Lookofsky stated that only the victim's interview was admitted into evidence and played for the jury. He explained that there were two different video discs. One contained interviews of four children, while the other contained only the victim's interview. Lookofsky stated that only the latter disc was entered into evidence. He was not sure whether it was sent to the jury. However, the court noted that there was no indication in the record that any evidence was sent to the jury room during deliberations. We note that our review of the transcript reveals that no evidence was sent to the jury room during deliberations.

¶ 37    The defendant also revisited two of his earlier allegations. First, he reiterated his claim about the newspaper article. Lookofsky handed the defendant a copy of the article. The court gave the defendant an opportunity to read the article, then asked, "Mr. Lookofsky did hand you a newspaper article. You've had an opportunity to review that. Is there anything else you want me to consider regarding the newspaper?" The defendant replied, "That it was put in the newspaper prior to trial."

¶ 38    Finally, the defendant turned his attention to his claim concerning prospective juror Thompson's statements. The defendant noted that all the other prospective jurors heard Thompson

say that his son-in-law was a deputy and that he could not be fair and impartial because of what his son-in-law told him about the case. The defendant argued that, even though Thompson did not reveal what his son-in-law told him, this statement "still makes [him] look bad in front of all the other potential jurors."

¶ 39 After considering the defendant's final allegation and his additional arguments, the court denied the defendant's motion. This appeal followed.

¶ 40                                   II. ANALYSIS

¶ 41 The defendant argues that the court erred by failing to conduct the preliminary *Krankel* hearing in a neutral, nonadversarial manner. This is so, he contends, because the court (1) required the defendant to be sworn in as a witness, but did not impose the same requirement on Lookofsky or Lamken; (2) asked the defendant questions that were argumentative and "attempt[ed] to prove a point that was not in contention"; (3) asked questions of Lookofsky that seemed to "invite Mr. Lookofsky to ratify the court's method of questioning prospective jurors"; and (4) failed to question Lookofsky on all relevant matters. The defendant further contends that, as a result, the court "failed to develop, explore, and create a complete record for Harding's claims that his attorney failed to inquire as to whether the jury pool was improperly influenced by pretrial publicity and the comments of prospective juror during *voir dire*." We are not persuaded.

¶ 42 Under *Krankel* and its progeny, the trial court has a duty to conduct an inquiry into the factual basis of a defendant's *pro se* claims of ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11 (citing *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003)). Preliminary *Krankel* inquiries serve "the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39.

11

¶ 43    The procedure to be followed at a preliminary *Krankel* hearing "is somewhat flexible." *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40. The court may consider its own recollections of counsel's performance during the trial. The court may also discuss the allegations with the defendant and ask questions of trial counsel. Indeed, in most cases, it is necessary for the court to do so. *Id*. ¶ 39. The court may also consider whether the defendant's claims are facially inadequate. *People v. Jackson*, 2020 IL 124112, ¶ 110.

¶ 44    Regardless of the precise procedure followed, the preliminary inquiry must be adequate to allow the court " 'to determine the factual basis of the [defendant's] claim[s].' " *Ayres*, 2017 IL 120071, ¶ 11 (quoting *People v. Banks*, 237 Ill. 2d 154, 213 (2010)). The court must also conduct the hearing in a neutral and nonadversarial manner. *People v. Jolly*, 2014 IL 117142, ¶ 38.

¶ 45    If the court determines that the defendant's claims lack merit or that they involve matters of trial strategy, the court may deny the defendant's claims without appointing a new attorney. *Moore*, 207 Ill. 2d at 78. If, however, the defendant's allegations "show possible neglect of the case" by trial counsel, the court should appoint a new attorney to represent the defendant at a hearing on those claims. *Id*.

¶ 46    On appeal, our " 'operative concern' " is whether the preliminary *Krankel* inquiry was adequate. *Jackson*, 2020 IL 124112, ¶ 98 (quoting *Moore*, 207 Ill. 2d at 78). We review *de novo* the question of whether the court conducted the preliminary inquiry in a proper manner. If it did so, we will reverse the court's determination regarding the merits of the defendant's claims only if we find that determination to be manifestly erroneous. *Id*.

¶ 47    We note that in arguing that the court failed to create a complete record concerning his allegations of possible neglect of his case, the defendant discusses only two of the claims he raised in the trial court—his claim that prospective jurors may have been influenced by the newspaper

12

article and his claim that they may have been influenced by the statements of prospective juror Thompson during *voir dire*. Because arguments not set forth in an appellant's brief are forfeited, we will limit our discussion to these two claims as well. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). With this limitation in mind, we turn our attention to the merits of the defendant's argument.

¶ 48    As stated previously, the defendant's chief complaint is that the court did not conduct the inquiry in a neutral and nonadversarial manner, as required by our supreme court. See *Jolly*, 2014 IL 117142, ¶ 39. We note that most cases addressing this requirement arise in the context of improper participation in the proceedings by the State. See, *e.g.*, *Jackson*, 2020 IL 124112, ¶ 108; *Jolly*, 2014 IL 117142, ¶¶ 26-27; *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 27; *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 86; *Fields*, 2013 IL App (2d) 120945, ¶¶ 37, 40. Any State participation in preliminary *Krankel* hearings should be *de minimis*, and must not include taking "an adversarial role against a *pro se* defendant." *Jolly*, 2014 IL 117142, ¶ 38. Here, prosecutor Lorinda Lamken responded when the court asked for clarification of one of the defendant's allegations. However, her participation in the proceedings was properly limited to providing "concrete and easily verifiable *facts*" (emphasis in original) (*Fields*, 2013 IL App (2d) 120945, ¶ 40). The defendant does not contend that Lamken took an adversarial role or that her participation was more than *de minimis*. Instead, he challenges acts and omissions by the court.

¶ 49    While the instant case is thus not analogous to the cases addressing improper State participation, we find it helpful to consider *why* those cases limit State participation in preliminary *Krankel* proceedings. In addressing that very question, this court has previously explained:

        "The State's participation in preliminary *Krankel* proceedings is limited by the

        nature of those proceedings. As our supreme court explained in *Jolly*, the purpose of the

        preliminary inquiry is to enable the court to create 'an objective record for review' of the

defendant's claims 'and thus potentially limit issues on appeal.' [*Jolly*, 2014 IL 117142,] ¶¶ 38-39. The goal of creating an objective record for review is thwarted if the State is permitted 'to bias the record against a *pro se* defendant' by subjecting the evidence or information gleaned at the preliminary inquiry to 'one-sided adversarial testing.' *Id.* ¶ 39. In addition, State participation in a preliminary inquiry creates a risk that the inquiry 'will be turned into an adversarial proceeding, with both the State and trial counsel opposing the defendant,' which is problematic because it forces a defendant to act *pro se* in an adversarial proceeding even if he has not waived the right to counsel. *Fields*, 2013 IL App (2d) 120945, ¶¶ 40-41." *People v. Jackson*, 2018 IL App (5th) 150274, ¶ 85, *aff'd*, 2020 IL 124112.

For the reasons that follow, we do not believe that the manner in which the court conducted the preliminary *Krankel* inquiry in this case ran afoul of any of these considerations.

¶ 50    Earlier, we described what occurred during the preliminary *Krankel* hearing in detail. The hearing was not perfect. Some of the court's questions to both the defendant and Lookofsky were somewhat leading. As the defendant asserts, these questions solicited responses confirming that the court asked appropriate questions during *voir dire*. In addition, the court denied the defendant's claim concerning his attorney's alleged failure to correct information about his prior history solely on the basis that the information was presented at sentencing, rather than at trial, even though claims of ineffective assistance of counsel at sentencing may also be addressed in *Krankel* proceedings. See, *e.g.*, *Patrick*, 2011 IL 111666, ¶ 37 (explaining the relief available to a defendant if he prevails on such a claim). However, the *voir dire* transcript provides an objective record demonstrating that the court properly questioned prospective jurors, and as noted earlier, the only claims addressed by the defendant in this appeal are those related to the newspaper article and the

statements of Thompson. Moreover, as we discussed, the court asked the defendant numerous open-ended questions that allowed him to present any allegations he wished to present. The court even allowed the defendant to present additional claims after beginning to rule from the bench. Thus, the defendant had ample opportunity to present the factual basis of his claims.

¶ 51    The defendant argues, however, that many of the court's questions to him were argumentative and addressed matters not raised in his allegations. In addressing prospective juror Thompson's statements, for example, the court asked the defendant whether Thompson revealed what his son-in-law had told him about the case or why he did not believe he could be a fair and impartial juror. The court also asked the defendant to confirm that Thompson was not selected for the jury. According to the defendant, these questions missed the point of his "concern that other prospective jurors heard Thompson say that he had knowledge of the case from a police officer that he could not put aside."

¶ 52    Implicit in this argument is a suggestion that merely hearing that a prospective juror has outside knowledge about a case that he cannot set aside is enough to lead other prospective jurors to assume that the unspecified outside information is negative. As the defendant stated to the court at the hearing, he believed Thompson's statement made him "look bad in front of all the other potential jurors." Simply put, however, this argument lacks merit on its face. See *Jackson*, 2020 IL 124112, ¶ 110 (stating that a court may deny a defendant's *pro se* claim of ineffective assistance of counsel if it is facially inadequate). The questions asked of prospective juror Thompson in this case were standard questions routinely asked of prospective jurors during *voir dire*. Thompson did not reveal what information he had heard about the case, and he stated that he had not formed an opinion about the defendant's guilt. The defendant cites no authority in support of the proposition

15

that neutral and nonspecific statements such as Thompson's can taint an entire jury pool, and we are aware of none.

¶ 53 The defendant likewise challenges the court's questions to Lookofsky on the matter of Thompson's statements. He notes that the court asked Lookofsky if he remembered the court asking prospective jurors whether they had any outside information about the case and, if so, whether it would prevent them from being fair and impartial. The defendant contends that such questions appeared "designed *** to ratify the court's method of questioning prospective jurors." The defendant also complains that the court did not ask Lookofsky why he failed to request that Thompson be questioned outside the presence of other prospective jurors or why he did not question other prospective jurors about the effect Thompson's statement had on them. As we have already explained, however, there is no merit to the defendant's contention that Thompson's statements had the potential to taint the entire jury pool. Thus, we do not believe it was necessary for Lookofsky to take either of these actions during *voir dire*, and the court was not required to ask him at the *Krankel* hearing why he did not take actions that were not warranted under the circumstances.

¶ 54 The defendant makes similar arguments concerning the court's questions regarding the potential for prejudice from the newspaper article. However, this claim is rebutted by the transcript from *voir dire*. In particular, as we discussed earlier, the court asked all prospective jurors whether they had read or heard anything about the case from any source, including newspaper articles. With the exception of Thompson, no prospective jurors indicated that they had heard anything about the case. Because all prospective jurors indicated that they had not heard anything about the case, including from newspaper articles, there was no need for Lookofsky to ask prospective jurors

16

about the newspaper article during *voir dire*, nor was there any reason for the court to ask Lookofsky at the *Krankel* hearing why he did not do so.

¶ 55 For these reasons, we find that the court's inquiry was adequate to determine the factual basis for the defendant's claims. We further find that none of the court's questions or omissions impeded its ability to create an objective record for review. As such, we find no error.

¶ 56                                III. CONCLUSION

¶ 57 For the foregoing reasons, we affirm the ruling of the trial court.


¶ 58 Affirmed.